UNITED STATES of America,
Plaintiff-Appellee,

Donny Brurell Buckley and Alycia Marquese Buckley, by their parent and next friend Ruby L. Buckley, on behalf of themselves and all Negro school age children residing in the area served by the original defendants herein, Intervening Plaintiffs-Appellees,

v.

BOARD OF SCHOOL COMMISSIONERS OF CITY OF INDIANAPOLIS, INDIANA, et al., Defendants-Appellants.

Nos. 75–1730 through 75–1737, 75–1765, 75–1936, 75–1964, 75–1965 and 75–2007.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 3, 1975.

Decided July 16, 1976.

Theodore L. Sendak, Atty. Gen., Donald P. Bogard, Asst. Atty. Gen., William M. Evans, Lewis C. Bose, Donald A. Schabel, Richard D. Wagner, Richard L. Brown, Charles W. Hunter, Indianapolis, Ind., William O. Schreckengast, Beech Grove, Ind., Lawrence McTurnan, Charles G. Reeder,

Robert P. Kassing, Gary R. Landau, Indianapolis, Ind., for defendants-appellants.

R. Davy Eaglesfield III, John O. Moss, John Preston Ward, Charles D. Kelso, James B. Capehart, Indianapolis, Ind., Samuel J. Flanagan, Jr., Civ. Rights Div., Dept. of Justice, Brian K. Landsberg, Dept. of Justice, Washington, D. C., James B. Young, U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT and TONE, Circuit Judges.

SWYGERT, Circuit Judge.

This is the third review of successive desegregation orders in a suit brought in 1968 by the United States against the Board of School Commissioners of the City of Indianapolis. The issue before us, as in *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), concerns the appropriate exercise of federal equity jurisdiction. The district court, 419 F.Supp. 180, found two violations of the Equal Protection Clause upon which it based the interdistrict remedies that are at issue on this appeal. The first was the failure of the state to extend the boundaries of the Indianapolis Public School District (IPS) when the municipal government of Indianapolis and other governmental units in Marion County, Indiana, were replaced by a consolidated county-wide government called Uni-Gov. The second violation was the confinement of all public housing projects (in which 98 percent of the residents are black) to areas within the boundaries of the City of Indianapolis.

On the basis of these violations the district court determined that a limited interdistrict remedy would be appropriate. The court ordered a transfer of black IPS students in grades 1–9 to suburban school districts (except two) within Marion County in such number as to cause the total enrollment of pupils in the suburban schools to be 15 percent black after the transfer. The district court also enjoined the Housing Authority of the City of Indianapolis from constructing any future public housing projects inside the boundaries of IPS and

from renovating a housing project known as Lockefield Gardens for other than elderly persons.

On the basis of the entire record and the findings of the district court, we affirm.

I

*The History of the Case*

The history of this litigation was described in our most recent opinion, *United States v. Board of School Commissioners of City of Indianapolis, Indiana*, 503 F.2d 68, 71–75 (7th Cir. 1974), *cert. denied*, 421 U.S. 929, 95 S.Ct. 1654, 44 L.Ed.2d 86, nonetheless, a brief summary is appropriate.

There have been four phases in this suit. In *Indianapolis I* the sole issue was racial segregation within the schools in the Indianapolis Public School District. Judge Dillin, after noting Indiana's official policy of school segregation until 1949, reviewed the conduct of IPS since that year and found the school district guilty of *de jure* segregation. *United States v. Board of School Commissioners of City of Indianapolis, Indiana*, 332 F.Supp. 655 (S.D.Ind.1971).

The court then ordered the United States to add as defendants other school districts in the metropolitan area in order to provide the proper setting for consideration of the appropriateness of a metropolitan remedy. The Government complied with the order. The Buckley plaintiffs, representing a class of black school children, were granted permission to intervene. They joined as defendants several state officials and additional school districts.

On appeal this court affirmed, finding that there was a clear pattern of purposeful discrimination in the gerrymandering of school attendance zones, in the segregation of faculty, in the use of optional attendance zones among the schools, and in school construction and placement—a "[P]attern of decision making which . . . reflected a successful plan for *de jure* segregation." *United States v. Board of School Commissioners of City of Indianapolis, Indiana*, 474 F.2d 81, 84–88 (7th Cir. 1973), *cert. denied*, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041.

After remand from this court, the district court in *Indianapolis II* took up the problem of fashioning a remedy. One of the issues at trial was the constitutionality of the Uni-Gov Act. The court ordered a remedy without reaching this question. The court found that a meaningful permanent desegregation plan could not be accomplished within the boundaries of IPS, based upon evidence that when the percentage of blacks in a given school approaches 25 to 30 percent white flight accelerates, resulting in resegregation. *United States v. Board of School Commissioners of City of Indianapolis, Indiana*, 368 F.Supp. 1191 (S.D.Ind. 1973). The court further found that the State of Indiana, its officials, and agencies by various acts and omissions promoted segregation and inhibited desegregation within IPS, so that the state which was ultimately charged under the Indiana law with the operation of its public schools had a continuing affirmative duty to desegregate the Indianapolis school system.

The court then ordered a broad interdistrict remedy which encompassed the entire metropolitan area including school districts outside of Marion County. The court held it was the duty of the state, through its General Assembly, to devise its own plan of desegregation, with the understanding that if it failed to do so within a reasonable time the court would have the authority and duty to formulate its own plan. As interim relief, the court ordered IPS to effect pupil reassignments for the 1973–1974 school year sufficient to bring the number of black pupils in each of its elementary schools to approximately 15 percent.

In response to the court's order for the interim relief, IPS submitted a desegrega-

tion plan. The court rejected it as inadequate and appointed a two-member commission to develop a plan. This plan was approved by the court and has been implemented. The district court also ordered IPS to transfer to certain defendant school districts a number of black pupils equal to 5 percent of the 1972–1973 enrollment of each transferee school (with certain exceptions). (This portion of the order was stayed incident to subsequent proceedings.) *United States v. Board of School Commissioners of City of Indianapolis, Indiana*, 368 F.Supp. 1223 (S.D.Ind.1973).

In *Indianapolis III* the court issued a supplementary opinion in which Judge Dillin proffered recommendations to the State of Indiana for implementing a desegregation plan. In response, the General Assembly adopted a bill that provides for the adjustment of tuition among the transferor and the transferee districts and for the reimbursement of transportation costs by the state whenever a federal or state court makes certain findings.[1]

On appeal from *Indianapolis II* and *Indianapolis III* this court, besides affirming the commission's interim IPS plan, affirmed the district court's holding that the State of Indiana, as the ultimate body charged with responsibility of operating its public schools, "[H]as an affirmative duty to assist the IPS Board in desegregating IPS within its boundaries . . . ." *United States v. Board of School Commissioners*, 503 F.2d 68, 80 (7th Cir. 1974), *cert. denied*, 421 U.S. 929, 95 S.Ct. 1654, 44 L.Ed.2d 86. This court, however, in accordance with *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), reversed the district court's order pertaining to the interdistrict

1. The Indiana Statute, Acts 1974, P.L. 94, § 1; I.C.1971, 20–8.1–6.5–1, Burns Ind.Stat.Ann. § 28–5031 (1971), provides in pertinent part: This chapter applies solely in a situation where a court of the United States or of the State of Indiana in a suit to which the transferor or transferee corporation or corporations are parties has found the following: (a) a transferor corporation has violated the equal protection clause of the fourteenth amendment to the Constitution of the United States by practicing de jure racial segrega-

tion of the students within its borders; (b) a unitary school system within the meaning of such amendment cannot be implemented within the boundaries of the transferor corporation, and (c) the fourteenth amendment compels the court to order a transferor corporation to transfer its students for education to one or more transferee corporations to effect a plan of desegregation in the transferor corporation which is acceptable within the meaning of such amendment.

remedy as to those school districts outside of Uni-Gov (Marion County). That portion of the order pertaining to the interdistrict remedy within Uni-Gov was vacated and remanded for further proceedings. We said:

The district court should determine whether the establishment of the Uni-Gov boundaries without a like reestablishment of IPS boundaries warrants an inter-district remedy within Uni-Gov in accordance with *Milliken*. 503 F.2d at 86.

On remand, in *Indianapolis IV*, 419 F.Supp. 183, the district court held another evidentiary hearing on Uni-Gov and housing practices within Marion County. In regard to Uni-Gov Judge Dillin found:

The evidence clearly shows that at the time of the passage of the Uni-Gov Act in 1969, various annexation plans and school consolidation plans had bogged down on the local level because of the aforementioned opposition of the suburban school corporations within Marion County, and their patrons. . . . When the General Assembly [which under state and federal law had a duty to alleviate segregation in IPS] expressly eliminated the schools from consideration under Uni-Gov, it signaled its lack of concern with the whole problem and thus inhibited desegregation [*sic*] IPS.

Referring to the suburban Marion County units of government, he stated:

They have resisted school consolidation, they resisted civil annexation so long as civil annexation carried school annexation with it, they ceased resisting civil annexation only when the Uni-Gov act made it clear that the schools would not be involved. Surburban Marion County has resisted the erection of public housing projects outside IPS territory, suburban Marion County officials have refused to cooperate with HUD on the location of such projects, and the customs and usages of both the officials and inhabitants of such areas has [*sic*] been to discourage blacks from seeking to purchase or rent homes therein, all as shown in detail in previous opinions of this Court.

With respect to the public housing authorities the district judge said:

The evidence is undisputed that each and every public housing project constructed and operated by the added defendant HACI is located within IPS territory, in some instances just across the street from territory served by one of the added defendant school corporations. Each of such locations was approved—in some instances selected in the first place—by the added defendant Commission. The latter institution has had county-wide zoning jurisdiction at all times during the construction of 10 out of the 11 public housing projects for families, and HACI has at all times had the authority to erect public housing within the City of Indianapolis, and within five miles of the corporate limits of such city. The residents of said public housing projects are approximately 98% black (except in projects for the elderly), and their children all attend school in IPS. The location of these housing projects by instrumentalities of the State of Indiana has obviously tended to cause and to perpetuate the segregation of black pupils in IPS territory.

Based on these findings and those set forth in his former opinions, Judge Dillin ruled that an interdistrict remedy was necessary to effect desegregation within IPS. He again found that if desegregation were limited to IPS, schools within IPS would become 42 percent black, and that this percentage exceeded the "tipping point" at which resegregation would occur. He commented:

The Court of Appeals has called the attention of this Court to the rule of law that "white flight" is not an acceptable reason for failing to dismantle a dual school system. 503 F.2d 80, citing *United States v. Scotland Neck City Board of Education*, 407 U.S. 484, 491, 92 S.Ct. 2214, 2218, 33 L.Ed.2d 75 (1970). However, it does not follow that this Court must ignore the probability of white flight in attempting to formulate guidelines for IPS to follow in accomplishing

the final desegregation of its schools. In other words, as this Court sees it, white flight may not be used as an excuse for inaction; it may, however, supply the reason for a particular kind of action.

Judge Dillin therefore ordered the transfer of 6,533 students from IPS to other school districts in Marion County. An additional 3,000 students were to be transferred in the second year of the plan, raising the proportion of black students in the suburban schools to 15 percent.[2] No transfers were ordered to Washington and Pike Townships, which already had black populations of 15 and 12 percent. The district court also enjoined the Housing Authority from building any more family housing projects in IPS territory and from renovating an all black project called Lockefield Gardens. Finally, the Buckleys were awarded attorneys' fees under 20 U.S.C. § 1617.

All the defendants have appealed. The defendants other than the Housing Authority challenge the interdistrict transfers ordered by the district court. The Housing Authority challenges the injunction against it. On the other side, the Buckleys, together with an *amicus curiae*, the Coalition for Integrated Education, argue for affirmance of the district court order. The United States argues that the finding of interdistrict violations should be sustained but seeks modification of the portion of the order calling for mandatory interdistrict transfers of students. It argues for affirmance of the injunction against the Housing Authority.

2. IPS will be obligated to pay the suburban school districts the cost of educating the transferred pupils. See *supra* n. 1.

3. The black population in Marion County is reflected by the following map.

1973
Percentage of Black Residents in Marion County
(Percentage of Black Students in Marion County Schools)

## II

*Facts Pertinent to this Appeal*

### A. Residential and School Demography of Marion County

In 1969 when Uni-Gov was created, 95 percent of the blacks in Marion County lived in Indianapolis. Only about 50 percent of the whites in the county lived in the city. The black population continues to grow within the core city as reflected by the ratios in the schools. The percentage of black students in IPS increased from 36 percent in 1968 to 42 percent in 1975. The 1974–1975 black/white ratio in IPS was 57.-22 percent white and 42.16 percent black. On the other hand, the overall ratio in Marion County was 74.87 percent white and 24.40 percent black.[3] For the years 1974–1975 the racial composition of the suburban school districts within Marion County (other than Pike and Washington) was as follows:

| Township | Percentage of White | Percentage of Black |
|---|---|---|
| Decatur | 99.83 | .9 |
| Franklin | 99.35 | .54 |
| Lawrence | 95.50 | 2.9 |
| Perry | 98.64 | .23 |
| Warren | 98.61 | .73 |
| Wayne | 97.87 | 1.19 |
| Beech Grove | 99.64 | .04 |
| Speedway | 99.10 | .72 |

### B. Uni-Gov

Until 1969 the boundaries of IPS corresponded roughly to the boundaries of the City of Indianapolis, and the other Marion County school districts were truly suburban. In 1969, however, the so-called Uni-Gov Act, which is officially titled the "Consoli-

dated First-Class Cities and Counties Act," Acts 1969, ch. 173, § 101; I.C.1971, 18–4–1–1 et seq., Burns Ind.Stat.Ann. §§ 48–9101 et seq. (1971), transformed Marion County into a consolidated metropolitan government. School districts were specifically excluded from Uni-Gov.

Uni-Gov is governed by a mayor and council. Its purpose was to efficiently reorganize civil government within Marion County. Previously, there had been a splintering of governmental responsibility into loosely controlled agencies with overlapping jurisdictions. Uni-Gov has succeeded to most of the functions of county government and of numerous special service districts. It has also succeeded to the functions of the City of Indianapolis and provides municipal services such as police and fire protection within the approximate area of the old city. The Act contains provisions for expanding the areas in which Uni-Gov delivers these municipal services. See, e. g., I.C.1971, 18–4–12–36 (fire district); I.C.1971, 18–4–12–8 (police district).

Uni-Gov has not, however, replaced all existing governmental units in Marion County. For example, the airport authority, the county courts, the building authority, and the hospital corporation were excluded from Uni-Gov. The so-called "excluded cities" of Speedway, Perry, and Lawrence retain their own local governments which provide municipal services in those areas. Nonetheless, Uni-Gov has significant powers even in the excluded cities. It is in charge of air pollution regulation, building code enforcement, and municipal planning and thoroughfare control. Moreover, the citizens of the excluded cities vote in Uni-Gov elections.

C. History of Public Housing

Between 1966 and 1970 the Housing Authority built and opened for occupancy ten housing projects for low-income families. These and Lockefield Gardens, which was built during the depression, are the only public housing projects for family occupancy in Marion County, although other forms of subsidized housing are available. All ten

projects were built within the boundaries of IPS. These projects opened with 50 to 75 percent black occupancies and are now 98 percent black.

The Housing Authority was authorized under state law to construct projects within Indianapolis and within five miles of the city's boundaries. Federal funding could be obtained only if the Housing Authority entered into a cooperation agreement with the municipality or other civil governmental entity having jurisdiction over the territory in which it desired to build. The City of Indianapolis entered into a cooperation agreement with the Housing Authority, but no other governmental entity in Marion County did so, even though the Housing Authority approached the county commissioners about an agreement.

Since 1969, when Uni-Gov became effective, the Housing Authority has apparently had the authority to construct projects outside the old city limits, except in the Towns of Speedway, Lawrence, and Beech Grove, without the need for cooperation agreements. No housing projects have been commenced within or outside IPS since that time nor are any planned. The record does not show why. There are presently pending applications for approximately 3,000 families.

The Housing Authority argued that suitable sites did not exist outside the City of Indianapolis because services such as public transportation would have been unavailable. There was evidence, however, that these services could have been arranged. The evidence showed that public transportation routes could have been extended to areas of demonstrated need, that food stamp distribution offices could have been established at the projects, that sewage services could have been obtained by contract with the city, and that police and fire protection could have been obtained from the city.

Six of the housing projects are on the IPS boundary lines or within a few blocks thereof. For example, Clearstream Gardens was located on the IPS side of a street which divided IPS and Warren Metropolitan

School District. A witness for the Housing Authority, under questioning by the district court, was unable to state why, "from the standpoint of these criteria you mentioned," there was "any difference at all between the location on the east side or the west side of Emerson Avenue." The other projects and their locations are set forth below.[4] These projects contain between 900 and 1,000 family units and house a substantial number of black school children.

*D. History of School District Boundaries*

Until 1969, under a variety of laws which are discussed below, the IPS boundaries were largely coterminous with the city boundaries. Under a 1931 act, the boundaries of IPS were made coterminous with those of the city. Acts 1931, ch. 94, § 1; I.C.1971, 20–3–11–1, Burns Ind.Stat.Ann. § 28–2601 (1971).[5] Until 1959, boundaries of school districts and municipalities were also coterminous elsewhere in Indiana, with some exceptions, and the IPS boundaries merely reflected the generally prevailing condition.

In 1959 the Indiana School Reorganization Act, Acts 1959, ch. 202, § 1; I.C.1971, 20–4–1–1 et seq., Burns Ind.Stat.Ann. § 20–4–1–1 et seq. (1975), created a complex scheme for consolidating school districts. Consolidations under the Act reduced the number of school districts outside Marion County from 990 to 305. Some 70 percent of the reorganized districts were not coterminous with other units of civil govern-

ment. In some cases consolidated school districts crossed county lines.

Marion County, however, was an exception. School districts there were not consolidated. The Marion County Reorganization Committee, appointed pursuant to the Act, initially recommended that all school systems in the county be merged into one, but the unanimous opposition of the suburban school districts defeated the merger proposal. There is no evidence that this opposition was racially motivated.[6] The Committee's ill-fated consolidation proposal was intended to "develop equal educational opportunities for all children in Marion County," and to "eliminate the confusion of school transfers and dislocations involved in annexation proceedings."

The most substantial reasons against consolidation noted in the Committee's report were that a consolidated school district would be large, with consequent loss in citizen participation and interest in school affairs, and that merger would result in increased school taxes in IPS and two of the suburban districts. The Committee explained that the consolidation plan "had no widespread support—only organized opposition," and that it did not wish to "force a plan (however sound in its conception) upon an unwilling or reluctant public." So, although it believed the arguments in favor of its plan far outweighed the opposition arguments, the Committee, as the district court found, "[R]eversed itself and proposed a plan which, with minor exceptions . .

---

4. Rowney Terrace is ten blocks north of Clearstream Gardens on the same boundary line between IPS and Warren Metropolitan School District (MSD).

   Raymond Villa is approximately four blocks north of the boundary line between IPS and Beech Grove.

   Laurelwood is in a narrow peninsula of IPS that is surrounded on three sides by Perry MSD.

   Concord Village is approximately one-half mile from the Speedway boundary.

   Eagle Creek is on the boundary line between IPS and Wayne MSD.

5. Acts 1963, ch. 310, § 4; I.C.1971, 20–3–11–33, Burns Ind.Stat.Ann. § 28–2633 (1971), provides that the 1931 act remains in effect except to the

extent that its various provisions are inconsistent with the 1959 act discussed in the text. The provision of the 1931 act making IPS boundaries coterminous with those of Indianapolis is inconsistent with the 1959 act and consequently was not reenacted by the 1963 act. The 1963 act did not purport to affect the provisions of the 1961 act discussed in the text.

6. The district judge's comment is pertinent. "In fact, the evidence shows that, with a few exceptions, none of the added defendants have had the opportunity to commit such overt acts because the Negro population residing within the borders of such defendants ranges from slight to none, . . ." *United States v. Board of School Commissioners*, 368 F.Supp. at 1203.

froze all existing school corporations in Marion County according to their then existing 1961 boundaries." *United States v. Board of School Commissioners*, 368 F.Supp. 1191, 1203 (S.D.Ind.1973). The Committee thereby abandoned both its merger plan and a less radical plan which would have restructured school boundaries on what the Committee regarded as a more rational basis than existing boundaries. Accordingly, the plan adopted in 1962, after approval by the state, did not significantly change boundaries in Marion County, but left those boundaries coterminous with those of civil governmental bodies.

As a result of the 1959 Reorganization Act, school boundaries in most of the state were frozen and thereafter unaffected by municipal annexations. In 1961, however, special legislation was enacted to give the schools within Marion County the flexibility lost by the 1959 Reorganization Act. Acts 1961, ch. 186, § 1; I.C.1971, 20–3–14–1 *et seq.*, Burns Ind.Stat.Ann. § 28–3610 (1971). Under the 1961 act extension of the boundaries of a civil city automatically extended the corresponding school district boundaries unless the school city and the losing school corporation mutually agreed that the school city territory would not expand with the civil city. The school district whose territory was to be taken could also oppose the civil annexation in a remonstrance suit. The annexation powers of the city, however, proved to be illusory, for they were effectively frustrated by remonstrance litigation.[7]

Another means of annexation under the 1961 act was by mutual agreement between school corporations. IPS (and other school districts with boundaries corresponding with those of a civil city) also had a unilateral power of annexation subject to the right of the school district whose territory was to be taken to oppose by remonstrance.

No significant action was taken by IPS under this provision.

In summary, until 1969, the combined action of the State of Indiana and its political subdivisions had the effect of leaving the boundaries of the City of Indianapolis and IPS substantially the same despite statewide school district consolidations made under the 1959 act. True, IPS could expand independently of the city, but the city's annexation prima facie carried IPS with it. Although it turned out that no annexations occurred, the policy of the state, as expressed in the 1961 legislation, was that IPS would expand along with the city.

In 1969, after this action was filed, two other acts were adopted. One act, Acts 1969, ch. 52, § 3; I.C.1971, 20–3–14–9, Burns Ind.Stat.Ann. § 28–3618 (1971), adopted sixteen days before Uni-Gov was enacted, amended the 1961 act by abolishing the power of IPS to follow municipal annexations. Another act, Acts 1969, ch. 239, § 407; I.C.1971, 18–5–10–25, Burns Ind.Stat.Ann. § 48–722 (1971), limited the remonstrances against municipal annexations to a few, simple, fairly objective grounds.

### III

■ The overall issue in this appeal is whether the limited interdistrict remedy ordered by the district court is supported by the record and is in accord with the legal principles enunciated in *Milliken v. Bradley*, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). Subsumed in the issue are two questions: (1) whether the establishment of Uni-Gov boundaries without a like reestablishment of IPS boundaries warrants an interdistrict remedy within Uni-Gov, and (2) whether the district court correctly enjoined the Housing Authority of the City of Indianapolis from locating any additional publicly funded housing projects within the boundaries of IPS and from renovating any existing facility for other than the elderly.[8]

---

7. This frustration of the city's annexation efforts was one of the reasons for Uni-Gov given by Mayor Lugar in his testimony before the district court.

8. The school district defendants argue that our mandate limited inquiry on remand to Uni-Gov

itself. It is true that our remand "[F]or further proceedings consistent with" *Milliken v. Bradley* was qualified by the specific direction to "[De]termine whether the establishment of the Uni-Gov boundaries without a like reestablishment of IPS boundaries warrants an inter-district remedy within Uni-Gov in accordance

In our opinion, *Milliken's* essential holding is contained in the following language written by Mr. Chief Justice Burger:

> The controlling principle consistently expounded in our holdings is that the scope of the remedy is determined by the nature and extent of the constitutional violation. *Swann v. Charlotte-Mecklenburg Brd. of Education*, 402 U.S. 1, at 16, 91 S.Ct. 1267, at 1276, 28 L.Ed.2d 554. Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. *Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation.* Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. Conversely, without an interdistrict violation and interdistrict effect, there is no constitutional wrong calling for an interdistrict remedy. (emphasis added.) *Milliken v. Bradley*, 418 U.S. 717, 744–45, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069.

That holding was further explicated in *Hills v. Gautreaux*, 425 U.S. 284, 296, 96 S.Ct. 1538, 1545, 47 L.Ed.2d 792 (1976), where Mr. Justice Stewart wrote:

> The Court's holding that there [*Milliken v. Bradley*] had to be an interdistrict violation or effect before a federal court could order the crossing of district boundary lines reflected the substantive impact of a consolidation remedy on separate and independent school districts. The District Court's desegregation order in *Milliken* was held to be an impermissible remedy not because it envisioned relief against a wrongdoer extending beyond the city in which the violation occurred but because it contemplated a judicial decree restructuring the operation of local governmental entities that were not implicated in any constitutional violation.

In *Milliken* the majority opinion also noted that, "[I]n its present posture, the case does not present any question concerning possible state housing violations." *Milliken v. Bradley, supra,* 418 U.S. at 728, n. 7, 94 S.Ct. at 3119. Mr. Justice Stewart, in his concurring opinion, explicitly explained the relevance of housing discrimination as it relates to an interdistrict remedy in school desegregation cases. Mr. Justice Stewart wrote:

> Were it to be shown, for example, that state officials had contributed to the separation of the races by drawing or redrawing school district lines, . . . by transfer of school units between districts, . . . or by purposeful, racially discriminatory use of state housing or zoning laws, then a decree calling for

with *Milliken*." *United States v. Board of School Commissioners*, 503 F.2d 68, 86 (7th Cir. 1974), *cert. denied*, 421 U.S. 929, 95 S.Ct. 1654, 44 L.Ed.2d 86. This direction, however, was itself qualified by a footnote quoting from passages in the opinion of the Court in *Milliken* and in Mr. Justice Stewart's concurring opinion. Both passages mention the drawing of school district lines on the basis of race as a possible ground for interdistrict relief; the former also includes as a possible ground discriminatory acts of other school districts; and the latter mentions "[P]urposeful, racially discriminatory use of state housing or zoning laws" by

state officials. *Id.* at n. 23. We interpret the mandate as sufficiently broad to permit consideration of official conduct which arguably bears a historical relationship to the failure to expand the IPS boundaries to match those of Uni-Gov, which includes the failure to change IPS boundaries during the 1959–1962 Indiana school reorganization program and the failure to locate any public housing outside the IPS boundaries. On the intervening plaintiffs' theory of the case, which the district court adopted, this course of conduct was a part of a pattern, of which Uni-Gov was also a part.

transfer of pupils across district lines or for restructuring of district lines might well be appropriate. *Id.* at 755, 94 S.Ct. at 3132.

With these holdings in mind we turn to the issue of Uni-Gov as it relates to an interdistrict violation.

Although Uni-Gov was a neutral piece of legislation on its face with its main purpose to efficiently restructure civil government within Marion County, it cannot be analyzed in isolation if its impact on school district boundaries is to be clearly perceived. Rather it must be considered in conjunction with the two other acts adopted in 1969. (See *supra* pp. 1217–1218.)

For some time Mayor Lugar had expressed his desire to embark on a more aggressive annexation program in order to bring a greater part of the urbanized area under the city's control. The concept of Uni-Gov was promoted as a more viable alternative to lengthy annexation litigation.[9] The suburban school corporations and their legislative representatives were obviously aware that if Uni-Gov did not pass and the civil city was forced to embark on a more aggressive annexation program as a last resort to reorganizing governmental services, IPS boundaries would automatically extend with the civil city boundaries under the 1961 Annexation Act.[10] In order to avoid this undesired result Chapter 52, 1969 Acts was enacted sixteen days before Uni-Gov was adopted. This Act repealed the provision in the 1961 Act which provided for automatic extension of school city boundaries with the extension of civil city boundaries. Chapter 239, 1969 Acts was also adopted, limiting remonstrances against municipal annexations to a few, simple, fairly objective grounds.

It must be kept in mind that at this time both the General Assembly and the suburban school districts knew that this action was pending in district court. These "fail safe" measures indicated a legislative intent (reflecting local sentiments) that by one means or another the boundaries of IPS would not expand with those of the civil city. We say this because a court is entitled to draw reasonable and logical inferences from probable consequences of changes in the law and the evident purpose of such changes.

Because, in 1969, 95 percent of the blacks in Marion County lived in the inner city and segregation in its schools was under attack in federal court, it is clear to us that Uni-Gov and its companion 1969 legislation were "[A] substantial cause of interdistrict segregation." *Milliken v. Bradley,* 418 U.S. 717, 745, 94 S.Ct. 3112, 3127, 41 L.Ed.2d 1069 (1974), and "[C]ontributed to the separation of the races by . . . redrawing school district lines . . . ." *Id.* at 755, 94 S.Ct. at 3132. (Stewart, J., concurring).

■■ The General Assembly, under both federal law as expressed in *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), and in *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and Indiana law as expressed in Acts 1949, ch. 186, §§ 1–6, 8, as amended Acts 1973, P.L. 218, § 1; I.C. 1971, 20–8.1–2–1—20–8.1–2–7, Burns Ind. Stat.Ann. § 28–5304 (1971), had an obligation to alleviate the segregated condition in IPS. The record fails to show any compelling state interest that would have justified the failure to include IPS in the Uni-Gov legislation. The desirability for a unitary civil government should not have precluded the General Assembly from considering the needs of the school system in its decision to enact Uni-Gov. As we noted earlier, the most substantial reasons advanced against the consolidation of the schools in Marion County when it was under consideration in 1959 were that a consolidated school district

---

9. Prior city administrations had not strongly pursued civil annexations and those that had been adopted were being effectively thwarted by remonstrances in the courts.

10. Under the 1961 Annexation Act the only way to avoid automatic extension of the school city boundaries, other than by remonstrance, was by mutual agreement between the acquiring and losing school corporations that the school city boundaries would not extend with the civil city boundaries.

would be large, with consequent loss of citizen participation, and that it would increase taxes. These considerations, although apparently not racially motivated, cannot justify legislation that has an obvious racial segregative impact. Administrative convenience cannot be a justification for violating the Equal Protection Clause. The district court correctly observed, "When the General Assembly expressly eliminated the schools from consideration under Uni-Gov, it signaled its lack of concern with the whole problem and thus inhibited desegregation with [*sic*] IPS."

In summary, we are convinced that the essential findings for an interdistrict remedy found lacking in *Milliken* are supplied by the record in the instant case. In *Milliken* the Supreme Court noted that the Detroit school boundaries were coterminous with the civil city boundaries and "[W]ere established over a century ago by neutral legislation . . . ." *Milliken v. Bradley,* 418 U.S. 717, 748, 94 S.Ct. 3112, 3129, 41 L.Ed.2d 1069 (1974). The Court also observed the district court did not find that the segregative acts within Detroit effected segregation within the other districts. *Id.* at 721, 94 S.Ct. 3112. Furthermore, the suburban school districts had not participated in the proceedings, *id.* at 722, 94 S.Ct. 3112, and finally, there had been no evidence of any racially discriminatory acts of the state which had been substantial causes of interdistrict segregation, *id.* at 745, 94 S.Ct. 3112. The remedy chosen by the district court required a consolidation of fifty-four districts "into a vast new super school district," *id.* at 743, 94 S.Ct. at 3126.

Indianapolis presents an entirely different situation. The Indianapolis Legislature acted directly in passing Uni-Gov, thereby creating the existing situation which confines black students within IPS. Moreover, the suburban governmental units made it politically expedient that Uni-Gov not include the schools.

■ In this case we are dealing with a situation in which but for certain events chargeable to the state, Marion County would be either a consolidated school district under the 1959 School Reorganization Act or IPS would have been expanded with the civil city of Indianapolis under Uni-Gov. In this context there is nothing talismanic about the word "district", for school district lines are not sacrosanct. *Milliken, supra* at 744, 94 S.Ct. 3112. The following hypotheticals are helpful in analyzing the problem.

(a) City A has one school district, coterminous with City A. The Government brings a suit, alleging *de jure* segregation in the city schools, particularly in the northeast portion of the city. The defendant school board agrees that the northeast portion of the city must be desegregated, but argues that a district-wide remedy is unnecessary, that is, that only the schools in the northeastern portion of City A need be affected. On these facts, *Keyes v. School District No. 1,* 413 U.S. 189, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), would control.

(b) City B has one school district that is coterminous with city boundaries. Perhaps fearing an impending desegregation suit, City B decides to contract its school district boundaries so that the school district encompasses the bulk of the central city while the outlying areas of the city organize their own school districts. On these facts, no federal court in a desegregation suit would hesitate in ordering the crossing of district lines to effect a remedy.

(c) City C decides to expand its boundaries and annexes the suburbs surrounding it into a unitary civil government. However, it retains its school district boundaries, previously coterminous with its former city boundaries. In every other respect it provides full city services in and exercises full city authority over the newly acquired territory. These facts are analogous to those of the case at bar. In the event of a meritorious desegregation suit in hypothetical City C, a district court could properly order an inter-district remedy under *Milliken.*

There is no dispute that a school district may not contract its territory in order to avoid desegregation. *Cf. Wright v. Council*

*of City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972). Conversely, a city should not be permitted to extend its boundaries in order to avoid desegregation.

*Evans v. Buchanan,* 393 F.Supp. 428 (D.Del.1975), *aff'd,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), is a case which is factually analogous to the instant case in many respects and in accord with *Milliken.* In *Evans* the district court had to consider the segregative effects of the Education Advancement Act of 1968, a Delaware school reorganization statute, which explicitly excluded the Wilmington district from a general reorganization of Delaware school districts. Although the district court concluded that the provisions excluding the Wilmington district from school reorganization were not purposefully, racially discriminatory, this did not end its inquiry. The court noted, "Statutes that do not explicitly deal with race but have a pronounced racial effect, . . . can also establish suspect racial classifications." *Evans v. Buchanan, supra* at 441. It further stated that "[W]here a statute, either explicitly or effectively, makes the goals of a racial minority more difficult to achieve than other related governmental interests, the statute embodies a suspect racial classification and requires a particularly strong justification." *Id.* The court therefore held that the Education Advancement Act, although racially neutral on its face, "[H]ad a significant racial impact on the policies of the State Board of Education, . . ." *id.* at 442–443, and thereby constituted a suspect classification. In effect, the statute prevented a predominantly black school district from being reorganized with a predominantly white suburban school district while other districts in the state were able to consolidate. The court finally concluded that "Neither . . . interest in preserving a historic school district boundary, nor the interest in maintaining districts with enrollments below 12,000 . . .," *id.* at 445, was a compelling state interest and did not justify the exclusion of Wilmington in the Education Advancement Act. On this basis the district court ordered an interdistrict remedy. The Supreme Court summarily affirmed.

In light of the above we find that the limited interdistrict remedy ordered by the district court was proper.

## IV

We now turn to the housing issue. As we stated above 95 percent of the black residents of Marion County live in the inner city. Surrounding the inner city are suburbs populated largely by white residents. This phenomenon may have many causes, but we think the district judge was correct in finding as the primary reason discrimination in the availability of housing opportunities for blacks in the suburbs. We are in agreement with Judge Dillin's statement:

> Although it is undoubtedly true that many factors enter into demographic patterns, there can be little doubt that the principal factor which has caused members of the Negro race to be confined to living in certain limited areas (commonly called ghettos) in the urban centers in the north, including Indianapolis, has been racial discrimination in housing which has prevented them from living any place else. *United States v. Board of School Commissioners,* 368 F.Supp. 1191, 1204 (S.D.Ind.1973).

Although the Housing Authority had jurisdiction outside the IPS boundaries, it did not locate any of the public housing projects in that territory. Instead, all ten of the public housing projects whose occupancy is 98 percent black were located within IPS. It is obvious that there is a close relationship between the racial balance in housing and the racial balance in schools. As Judge Dillin found in his 1971 opinion, "Low-rent housing projects within the School City have significantly affected the racial composition of the schools." *United States v. Board of School Commissioners,* 332 F.Supp. 655, 673 (S.D.Ind.1971). He reaffirmed this in his most recent decision, "The location of these housing projects by instrumentalities of the State of Indiana has obviously tended to cause and to perpetuate the segregation of black pupils in IPS

territory." The record supports these findings and clearly shows a "purposeful, racially discriminatory use of state housing." *Milliken v. Bradley,* 418 U.S. 717, 755, 94 S.Ct. 3112, 3132, 41 L.Ed.2d 1069 (1974) (Stewart, J., concurring). The Government's statement in its brief supports this view:

> Given that a disproportionate number of blacks are both in low income categories and were already concentrated in IPS and considering the predominantly black composition of the pool of applicants for the H.A.C.I. low-income housing projects, it is a reasonable inference that this action would and did have a further impact upon the racial compositions of schools and school districts in Marion County.

■ The Housing Authority contends the district court had no authority to enjoin it from building additional public housing within IPS and from renovating Lockefield Gardens for other than the elderly because the court could not lawfully find a constitutional violation by HACI in confining its housing projects to IPS territory. The evidence presented above, however, is to the contrary.

By locating its projects within IPS and in many cases near all black neighborhoods, the Housing Authority significantly contributed to the disparity in residential and school populations between the inner city and the suburbs. Its acts produced discriminatory effects both within IPS and the suburbs. The relief ordered by the district court was directed to correcting the effects of those past discriminatory acts. Accordingly, the district court did not abuse its discretion in enjoining the Housing Authority from building additional projects within IPS. That part of the injunction that relates to Lockefield Gardens was also proper since permitting it to be used for family housing, where school children are undoubtedly involved, would only further aggravate the school segregation problem.

## V

■ The Government contends that the mandatory transfer of students between IPS and the suburban schools ordered by the district court is improper. After conceding the import of *Milliken,* the propriety of interdistrict relief, and noting the specific finding of facts found by the district court to have substantially caused segregation in the other districts, the Government concludes the district court's order was an abuse of discretion. We are confused by the Government's reasoning. We fail to see how the district court abused its discretion when it was clearly acting within the guidelines of *Milliken.* It was not an abuse of discretion merely because the Government would have preferred another remedy.

Furthermore, the Government's arguments are inconsistent. On the one hand, it demands that segregation be eliminated root and branch from within IPS; on the other, it condemns the only relief which can make its demand a reality. We are surprised the Government seriously offers voluntary transfer as an alternative to mandatory transfer as a means to effectuate its goal of complete desegregation. History has taught us that "freedom of choice" plans produce negligible results. *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1967).

Even if we were to agree with the Government that voluntary transfers are desirable, Indiana law provides no secure mechanism for achieving this result. The Government suggests that voluntary transfers can be made in accordance with Acts 1973, P.L. 218, § 1; I.C. 1971, 20–8.1–6–1, Burns Ind.Stat.Ann. § 28–5001 (1971), which permits transfers under certain conditions.[11] We do not agree, however, that

---

11. The statute provides:

> *Transfer—General order.*—The governing body of any school corporation may grant an order of transfer upon proper application by the parent of any child who resides in that corporation if it feels the child may be better accommodated in the public schools of an-

other school corporation of this state or of an adjoining state. In determining whether a child can be better accommodated, such matters as the proximity of the schools to the residence of the child desiring the transfer, the kind and character of the roads, the means of transportation, and the crowded conditions of the school shall all be pertinent.

this law is sufficient to provide for the kind of transfers the district court ordered. The language in the statute is permissive and vague (a transfer *may* we granted if the school corporation feels a child may be better accommodated in another school) and does not contemplate transfers for desegregation purposes. We could hardly believe we were carrying out our duty to dismantle segregation root and branch if we were to choose this law to accomplish our goal.

The limited interdistrict remedy ordered by the district court is supported by the record and in accord the legal principles enunciated in *Milliken.*

In affirming the district court's order, we suggest that the court monitor the transference of black pupils from IPS to the other school districts periodically, perhaps on a yearly basis, in order that modifications, if necessary, may be made. This is in the hope that segregation and discrimination will be completely eradicated within IPS in furtherance of the goal of equal opportunity proclaimed two hundred years ago in the Declaration of Independence.[12]

AFFIRMED.

TONE, Circuit Judge, dissenting.[*]

There are only two possible interdistrict constitutional violations, in view of our decision on the second appeal, *United States v. Board of School Commissioners,* 503 F.2d 68 (7th Cir. 1974), *cert. denied,* 421 U.S. 929, 95 S.Ct. 1654, 44 L.Ed.2d 86 (1975), as the majority recognizes. These two possibilities are Uni-Gov and the Housing Authority's

location of public housing, as to both of which the District Court heard evidence and made findings on remand.

Whether these state actions violated the Equal Protection Clause depends upon the existence of a racially discriminatory purpose. Disproportionate effect on minorities without discriminatory purpose is not enough. If this was not clear after *James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971), *Jefferson v. Hackney,* 406 U.S. 535, 548–549, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972), and *Keyes v. School District No. 1,* 413 U.S. 189, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), it was made so by *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). The Court squarely held in the latter case that equal protection is denied only when the state acts with a racially discriminatory purpose:

"[O]ur cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact. [Original emphasis.]

\* \* \* \* \* \*

"The school desegregation cases have . . . adhered to the basic equal protection principle that the invidious quality of a law claimed to be racially discriminatory must ultimately be traced to a racially discriminatory purpose. That there are both predominantly black and

---

If there is no high school in the school corporation in which a child resides, the governing body shall grant an order of transfer. When a transfer is granted under this section, transfer tuition shall be paid as provided in this chapter.

**12.** Supplementing Judge Tone's footnote to his dissent, the author of this opinion acknowledges extensive borrowing from Judge Tone's original draft of an opinion, particularly with respect to the factual background of this case. That use made my task easier, and I am indeed grateful.

\* The writing of the court's opinion was initially assigned to me, my tentative vote at conference having been to affirm. After I had devoted

much time toward the preparation of an opinion, I came to the view reflected in this dissent. The writing of the court's opinion was therefore reassigned to Judge Swygert, who was already burdened with his share of the work of the Seventh Circuit but nevertheless had to find time for this case. While the results of my work on the record, which I made available to him, were I hope of some use in connection with the writing of his opinion, he got a very late start because of the circumstances just described. I recite this intramural history to record the reason for the unusual delay between oral argument and decision and the fact that Judge Swygert is not responsible for that delay.

predominantly white schools in a community is not alone violative of the Equal Protection Clause.

\*    \*    \*    \*    \*    \*

". . . Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." 426 U.S. at 239–242, 96 S.Ct. at 2047–2049.

The record before us does not contain findings or evidence that the state acted with a racially discriminatory purpose in connection with Uni-Gov or public housing siting.[1] An essential element of an equal protection violation is therefore missing.

One other governing principle should be noted at the outset. *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), in language we are not free to ignore, focused on the constitutional right to be vindicated. Amplifying the statement quoted by the majority that "the scope of the remedy is determined by the nature and extent of the constitutional violation," *id.* at 744, 94 S.Ct. at 3127, the Supreme Court said two pages later:

"Disparate treatment of white and Negro students occurred within the Detroit school system, and not elsewhere, and on this record the remedy must be limited to that system. . . .

"The constitutional right of the Negro respondents residing in Detroit is to attend a unitary school system in that district. Unless petitioners drew the district lines in a discriminatory fashion, or arranged for white students residing in the Detroit District to attend schools in Oakland and Macomb Counties, they were under no constitutional duty to make provisions for Negro students to do so. The view of the dissenters, that the existence of a dual system in Detroit can be made the basis for a decree requiring cross-district transportation of pupils, cannot be supported on the grounds that it represents merely the devising of a suitably flexible remedy for the violation of rights already established by our prior decisions. It can be supported only by drastic expansion of the constitutional right itself, an expansion without any support in either constitutional principle or precedent." *Id.* at 746–747, 94 S.Ct. at 3128 (footnote omitted).

That *Milliken* controls here, apart from the additional evidence on Uni-Gov and public housing, was of course recognized in our decision on the second appeal, in which we reversed the portion of the District Court's order calling for interdistrict relief outside the Uni-Gov territory. That decision was a recognition that, in the language of *Milliken,* "[t]he constitutional right of the Negro respondents residing in [IPS] is to attend a unitary school system in that district," *id.,* and an interdistrict remedy is not an appropriate means of vindicating that right. The question now is: What other constitutional rights, violation of which calls for an interdistrict remedy, were shown on remand to have been violated by Uni-Gov and the siting of public housing projects? The majority does not seem to me to answer that question.

The District Court did not find that the legislative decision to exclude IPS from

---

1. The criterion of racially discriminatory purpose is, of course, often not easy to apply. Even if, in any given case, a body such as a legislature or school board can be said to have a collective intent (see R. Dickerson, *The Interpretation and Application of Statutes* 67, *et seq.* (1975)), that intent is often difficult to ascertain. See Justice Powell's concurrence in *Keyes,* 413 U.S. at 217, 233–234, 93 S.Ct. 2686. For this reason Justice Stevens, concurring in *Washington v. Davis,* —— U.S. at ——, 96 S.Ct. at 2054, observed that "the line between discriminatory purpose and discriminatory impact is not nearly as bright, and perhaps not quite as critical, as the reader of the Court's opinion might assume," and based his concurring vote, in a manner reminiscent of Justice Harlan's concurring opinion in *Hunter v. Erickson,* 393 U.S. 385, 393, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), on the objective indicia that the governmental action was grounded on neutral principle. In the case at bar, this problem is not as knotty as it often is. Uni-Gov satisfies the neutral principle standard, and the search for collective legislative intent, which able counsel must have made, seems to have turned up no evidence whatsoever of racially discriminatory purpose on the part of anyone responsible for the legislation. The housing siting decisions are in a similar posture.

Uni-Gov was racially motivated.[2] The record would not have supported such a finding in view of both the absence of any direct evidence of such a motivation and the presence of such evidence as the historic context of opposition to county-wide school consolidation on non-racial grounds,[3] the decision to leave other government units out of Uni-Gov,[4] the fact that all school boundaries elsewhere in the state were already frozen, and the non-racial reasons and the haphazard fashion in which civil annexation had taken place in the past, which had done · nothing to establish rational school boundaries.[5] The appellees do not argue that the evidence shows a racially discriminatory purpose. In their briefs, filed before the

decision in *Washington v. Davis,* the government assumes, and the intervening plaintiffs argue, that such a purpose need not be shown.

A search in the opinion of this court's majority for a finding of racially discriminatory purpose will be unproductive. The majority finds (text at notes 9 and 10) that the General Assembly did not want IPS boundaries to expand with the city boundaries whether or not Uni-Gov was adopted[6] but does not follow with a statement that this desire or the actions effectuating it were racially motivated. Instead it goes on to state, citing *Milliken,* that "Uni-Gov and its companion 1969 legislation were 'a substantial cause of interdistrict segregation'

2. Such a finding cannot be inferred from the District Court's statement that by not consolidating the schools under Uni-Gov, the General Assembly "signaled its lack of concern with the whole problem and thus inhibited desegregation with[in] IPS." Apart from doubt about whether there is any evidence that Uni-Gov had an inhibiting effect on desegregation, as distinguished from not promoting desegregation, the court has merely described an effect and not a purpose. A "lack of concern" does not amount to a racially discriminatory purpose. The state, like Michigan in *Milliken,* was under no direct constitutional duty to adopt interdistrict measures, and a duty to act could hardly arise from the fact that failure to act would "signal a lack of concern."

3. There is no evidence, as the majority recognizes, that the opposition to consolidation of Marion County School districts under the Indiana School Reorganization Act of 1959 (Ind. Code § 20–4–1–1, *et seq.*) was racially motivated. Nor is there any evidence that the failure to consolidate after that time or opposition to civil annexation was racially motivated. The District Court, in the course of the hearing on remand after our decision on the second appeal, spoke of the purpose of certain exhibits as being offered "to prove or tend to prove that the present division of Marion County into eleven separate school districts is something that happened because of reasons pertaining primarily to school finances as well as to the desire of non-IPS schools to maintain local autonomy rather than for reasons of separating students based on race. . . . I presume that if the Government or the intervening plaintiffs had some evidence to the contrary that they would be cross-examining, or examining along those lines." Neither the government nor the intervening plaintiffs offered any "evidence to the contrary" or cross-examined along the lines referred to.

4. Among those other governmental units were the Airport Authority, the Health and Hospital Corporation, the County Department of Welfare, the Building Authority, and the Library Districts. See Ind.Code § 18–4–3–14. The so-called "excluded cities" of Speedway, Perry, and Lawrence retained their own local governments, which provide municipal services in those areas, although Uni-Gov has the responsibility even in those areas for air pollution regulation, building code enforcement, municipal planning, and thoroughfare control.

5. The record indicates that the reasons for this and the resulting irregularities in the boundaries of Indianapolis were that in many instances residents protested annexation because they felt the city would not provide them with services commensurate with the additional tax money they would be paying (not an uncommon reason for opposition to annexation by municipalities large and small throughout the country), and in other instances commercial developers sought and gained the annexation of land they owned because they wanted benefits that could be obtained through annexation. Thus whether this land was annexed depended in large part upon the position taken by the owners of the land affected.

6. This inference is drawn from the adoption of Chapter 52, 1969 Acts (Ind.Code § 20–3–14–9) seven days before the adoption of Uni-Gov and the adoption of Chapter 239, 1969 Acts (Ind. Code § 18–5–10–25). The effect of these two acts was to eliminate the automatic expansion of IPS boundaries to match the expansion of city boundaries and to limit remonstrances against annexations. These acts were rendered nugatory by the adoption of Uni-Gov.

. . . and 'contributed to the separation of the races by . . . redrawing school lines . . . .' " [7] But under *Milliken,* as explained in *Washington v. Davis,* cause and effect are not enough. A racially discriminatory purpose is necessary. The closest the majority comes to finding a racially discriminatory purpose is in the abstract statement, at the end of the paragraph containing the three hypotheticals, that "a city should not be permitted to extend its boundaries in order to avoid desegregation." I believe that if this court intended to find as a fact that Uni-Gov was adopted with a racially discriminatory purpose, in the face of the failure of the District Court to find, and of the appellees to argue, that there was such a purpose, it would do so directly and state the evidentiary basis for that finding. As stated above, I believe there is no such basis in the record.

The majority attempts to avoid the necessity of finding discriminatory purpose by postulating an affirmative duty to desegregate under *Green v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and the Indiana statutes. It is doubtful that the Indiana legislature could impose on itself by statute the duty to pass additional statutes, and, if it could, violation of such a duty would not give rise to a federal constitutional claim. *Milliken's* teaching is that the state's constitutional duty under *Green* is commensurate with the violation, which, apart from the Uni-Gov events themselves, was a violation of the right to attend a unitary school system within IPS. Under *Milliken,* there can be no affirmative duty to use interdistrict means to remedy intradistrict violations; for if such a duty existed, the State of Michigan surely violated it in that case, which would have mandated the interdistrict remedy rejected by the Supreme Court, and there was no reason in the case at bar to exclude the territory outside Uni-Gov from the scope of our remand on the second appeal.

*Evans v. Buchanan,* 393 F.Supp. 428 (D.Del.1975), *aff'd,* 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), on which the majority relies, does not in my opinion support affirmance. That case, unlike the case at bar, involved a prior interdistrict violation mandating the adoption of interdistrict measures by state authorities. The district court opinion in *Evans* shows *de jure* segregation before *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), was practiced on an interdistrict basis in the Wilmington area. 393 F.Supp. at 437. The state failed to carry its burden of showing that these past acts of segregation had become so attenuated that "the current segregation is in no way the result of those past segregative actions," *Keyes v. School District No. 1, supra,* 413 U.S. at 211 n.17, 93 S.Ct. at 2699; in fact, post-*Brown* acts contributed to continued interdistrict segregation, see 393 F.Supp. at 434–436. Consequently, there was an affirmative duty to remedy the interdistrict violation, and the Delaware reorganization statute, by barring consolidation as a way of doing so, "contravene[d] the implicit command of *Green v. County School Board* . . . that all reasonable methods be available to formulate an effective remedy." *North Carolina State Board of Education v. Swann,* 402 U.S. 43, 46, 91 S.Ct. 1284, 1286, 28 L.Ed.2d 586 (1971).

The majority relies on the "racial impact" theory espoused by the district court in *Evans.* The summary affirmance of the three-judge district court's judgment does not necessarily imply approval of that court's reasoning, and that reasoning clearly cannot stand after *Washington v. Davis.*

In short, there is no finding and no evidence that the exclusion of IPS from Uni-Gov was racially motivated, and by all objective criteria Uni-Gov was racially neutral state action. Uni-Gov left untouched the boundaries of IPS, which had been established for racially neutral reasons. The changes in civil boundaries and realloca-

---

7. Failing to redraw the school district lines does not seem to me to be "redrawing school district lines," but this is not important to an analysis of the problem, because the control-

ling question is whether, however the legislature's action is described, it was taken with a racially discriminatory purpose.

tions of civil governmental functions made by Uni-Gov had no effect on the constitutional rights of school children in IPS.

### Public Housing

The District Court, while unconvinced by the reasons given for the selection by the Housing Authority of certain sites near the periphery of the City of Indianapolis, made no findings that any of the Housing Authority's decisions were racially motivated. As the majority notes, under federal statute (42 U.S.C. § 1415(7)(b)(i)) and HUD guidelines, the Housing Authority could not obtain federal funds for a project in the absence of a cooperation agreement with the local governmental authority obligating the latter to provide essential governmental services; and as the District Court found, "Suburban Marion County officials have refused to cooperate with HUD on the location of such projects." It is apparent from the record and the District Court's findings that this was the real reason housing projects were built only within the City of Indianapolis before the effective date of Uni-Gov. There was no finding and no evidence that the refusals were racially motivated. Failure of local authorities to enter into these agreements, without more, does not give rise to an inference of racially discriminatory purpose, even though the projects are to be occupied by large numbers of blacks. See *James v. Valtierra, supra,* 402 U.S. at 141, 91 S.Ct. 1331; see also *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 517 F.2d 409, 412–413 (7th Cir. 1975), *cert. granted,* 423 U.S. 1030, 96 S.Ct. 560, 46 L.Ed.2d 404 (1975). As these cases hold, the state's location of low-rent housing projects for racially neutral reasons, even though it has a disparate effect on minority groups, is not subject to strict scrutiny. *James v. Valtierra, supra,* 402 U.S. at 141, 91 S.Ct. 1331; *Metropolitan Housing Development Corp. v. Village of Arlington Heights, supra,* 517 F.2d at 413.[8] As the majority notes, the record is silent as to why no housing projects were commenced within IPS since the effective date of Uni-Gov. Absent a showing of discriminatory intent, I find no ground on which to sustain the injunction against the Housing Authority.

### Relief

In the absence of an interdistrict violation, there should be no interdistrict relief against the school corporation defendants. If I believed the majority were correct in finding interdistrict violations, I would agree that the remedy ordered by the District Court is within its discretion and would not have this court substitute its discretionary judgment for that of the District Court by ordering only the voluntary-transfer remedy urged by the government. In this connection, I do note that even when no constitutional violation has occurred, Indiana law provides relief to a student who is prevented by school district lines from attending the school nearest his home, Ind. Code § 20–8.1–6–1, *et seq.,* and the school authorities seem to be obligated to grant such relief, *State ex rel. Smitherman v. Davis,* 238 Ind. 563, 571, 151 N.E.2d 495, 498 (1958).

---

**8.** The majority does not rely on other acts of the state and private parties that had the effect of confining blacks to the IPS area, to which the brief of the United States refers. These acts which include recording racial covenants, discriminatory FHA loan practices and private discrimination by brokers, sellers, and others, were referred to by the District Court as "customs and usages of both the officials and inhabitants of such areas" which "discourage[d] blacks from seeking to purchase or rent homes therein, all as shown in detail in previous opinions of this Court." While the District Court was no doubt correct in this statement, the findings referred to and the evidence support-ing it were all in the record at the time of the last appeal, when we held that *Milliken* precluded relief outside Marion County, and are similar to findings and evidence in *Milliken.* See 418 U.S. at 724, 728 n.7, 94 S.Ct. 3112. If these facts had sufficed to justify an interdistrict remedy, the Supreme Court in *Milliken* would presumably either have affirmed on the familiar principle that a reviewing court will affirm on any basis supported by the record, even if not relied on by the lower court, or else would have remanded for further consideration of the housing issue. See, *e. g., Dandridge v. Williams,* 397 U.S. 471, 475 n.6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

I further believe that since the Housing Authority, unlike HUD in *Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976), has not been found to have engaged in purposefully discriminatory and therefore unconstitutional conduct, no relief against that agency is warranted.