UNITED STATES of America, Plaintiff-Appellee,

and

Donny Brurell Buckley, et al., Intervening Plaintiffs-Appellees,

v.

BOARD OF SCHOOL COMMISSIONERS of the CITY OF INDIANAPOLIS, INDIANA, et al., Defendants-Appellants.

Nos. 75-1730 through 75-1737, 75-1765, 75-1936, 75-1965 and 75-2007.

United States Court of Appeals, Seventh Circuit.

Feb. 14, 1978.

---

Theodore L. Sendak, Atty. Gen., Donald P. Bogard, Asst. Atty. Gen., William F. Harvey, Special Counsel, Atty. Gen., William M. Evans, Lewis C. Bose, Donald A. Schabel, Richard D. Wagner, Richard L. Brown, Charles W. Hunter, Indianapolis, Ind., William O. Schreckengast, Beech Grove, Ind., Lawrence McTurnan, Charles G. Reeder, Robert P. Kassing, Gary R. Landau, Indianapolis, Ind., for defendants-appellants.

R. Davy Eaglesfield III, John O. Moss, John Preston Ward, Charles D. Kelso, James B. Capehart, Indianapolis, Ind., Samuel J. Flanagan, Jr., Civ. Rights Div., Dept. of Justice, Brian K. Landsberg, Dept. of Justice, Washington, D. C., James B. Young, U. S. Atty., Indianapolis, Ind., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, and SWYGERT and TONE, Circuit Judges.

SWYGERT, Circuit Judge.

Our decision today is a continuation of protracted litigation which began in 1968 over whether and to what extent the public schools of Indianapolis must be desegregated. In our most recent opinion, we affirmed the district court's order calling for the busing of black students from within the Indianapolis Public School District ("IPS") to schools which are outside IPS but within Marion County ("Uni-Gov"). *United States v. Board of School Commissioners*, 541 F.2d 1211 (7th Cir. 1976). The Supreme Court vacated our judgment and remanded the case to this court for further consideration in light of *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), which require proof of racially discriminatory intent or purpose to show a violation of the Equal Protection Clause. *See* 429 U.S. 1068, 97 S.Ct. 802, 50 L.Ed.2d 786 (1977). For the reasons and in the areas set forth below, we now remand this case to the district court for further findings of fact.

I

Because of the age of this suit, its sheer size, the number of parties which have intervened or have been added during the course of the proceedings, and the fact that this case has made several trips through the appellate process,[1] we think it would help to summarize the present posture of this case, namely, to identify those issues which have been settled and those which remain unresolved. Before proceeding to do so, however, it is important to understand the three geographical areas which have at some point been the subject of this litigation. As illustrated by the diagram below, those three areas include: (1) IPS, whose boundaries are coterminous with the City of Indianapolis (before Uni-Gov), (2) suburban school districts within Marion County and, since the enactment of the Uni-Gov Act in 1969, within the boundaries of the City of Indianapolis (after Uni-Gov),[2] and (3) school districts which are outside of and adjacent to Marion County.

---

1. The history of this litigation was described in our most recent opinion. *See* 541 F.2d 1211, 1212–15 (7th Cir. 1976), *vacated and remanded*, 429 U.S. 1068, 97 S.Ct. 802, 50 L.Ed.2d 786 (1977).

2. Under the Uni-Gov Act, Ind.Code §§ 18–4–1–1 *et seq.*, the boundaries of the City of Indianapolis were expanded to and became coextensive with the boundaries of Marion County. The new consolidated city is now called the City of Indianapolis. Ind.Code § 18–4–1–4.

Scale 0 1 2 3 4 5 (miles)

On August 18, 1971, the district court found that the Indianapolis School Board was deliberately operating a *de jure* dual system on May 17, 1954 (date of *Brown I*), and had not changed its policies since that year in order to eliminate that *de jure* segregation. *United States v. Board of School Commissioners*, 332 F.Supp. 665 (S.D.Ind.1971). In affirming, this court said, "[I]t is clear that the district court found a purposeful pattern of racial discrimination based on the aggregate of many decisions of the Board and its agents." 474 F.2d 81, 84 (7th Cir.), *cert. denied*, 413 U.S. 920, 93 S.Ct. 3066, 37 L.Ed.2d 1041 (1973). After reviewing the

district court's findings regarding the gerrymandering of school attendance zones, the segregation of faculty, the use of optional attendance zones among the schools, and the pattern of school construction and placement, we held: "[T]he evidence of both segregatory intent and causation is substantial enough to support the district court's findings." *Id.* at 85.

On remand, the district court determined that state officials are ultimately charged under Indiana law with the responsibility of operating the public schools. The court further determined that these officials had caused and promoted segregation within IPS, so that the State had an affirmative

This new city includes all territory within Marion County except for the cities of Beech Grove, Lawrence, and Speedway ("excluded cities") which are permitted to carry on as separate municipal corporations. Ind.Code § 18–4–1–2. Cities in these excluded territories may still

vote in mayoral and city-county council elections, however, and they receive certain benefits from the consolidated City of Indianapolis. *See Dortch v. Lugar*, 225 Ind. 545, 266 N.E.2d 25, 35–37 (1971).

duty to assist the IPS Board in desegregating its schools. 368 F.Supp. 1191 (S.D.Ind. 1973). We affirmed this holding on appeal. 503 F.2d 68, 80 (7th Cir. 1974), *cert. denied,* 421 U.S. 929, 95 S.Ct. 1654, 44 L.Ed.2d 86 (1975). These rulings, finding both the Board and the State guilty of *de jure* segregation within IPS, now constitute the law of this case.[3] Accordingly, the parties and the courts are precluded from reexamining them. Desegregation remedies within the confines of IPS are therefore wholly appropriate.

The district court when fashioning a remedy was understandably concerned with the problem of "white flight." The court was opposed to a desegregation plan limited solely to IPS because evidence showed that such a plan would accelerate the white exodus with the resultant effect of resegregating the Indianapolis schools. The only feasible permanent desegregation plan, in the district court's view, was to order an interdistrict remedy which encompassed the entire metropolitan area, including the suburban districts within Marion County and the adjacent districts outside of the county (areas 2 and 3 in the diagram above). 368 F.Supp. 1191 (S.D.Ind.1973).

This court, under *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), reversed the district court's order pertaining to the interdistrict remedy as to those school districts outside Marion County (area 3). 503 F.2d 68, 86 (7th Cir. 1974), *cert. denied,* 421 U.S. 929, 95 S.Ct. 1654, 44 L.Ed.2d 86 (1975). This holding, as the one inculpating the State and the school board within IPS, is subject to the law of the case principle and therefore is closed to further examination.

The only issue before us, then, is whether the district court in the exercise of its equity jurisdiction may impose an interdistrict remedy which includes the transfer of students from IPS to the suburban districts within Marion County. Resolution of this issue necessarily presupposes an affirmative answer to each of the following subsumed questions: (1) whether at least one of the predicates for metropolitan relief as enunciated in *Milliken v. Bradley* is present, and (2) whether the relevant acts or omissions of state or local officials were motivated, at least in part, by a racially discriminatory purpose or intent as articulated in *Washington v. Davis* and *Arlington Heights.*

As will become more apparent below, resolution of these two preliminary questions requires remanding this case to the district court. On remand, the task of the district court is to make further findings of fact from evidence already in the record or, if necessary, as supplemented by additional evidence.

## II

Any decision as to whether interdistrict school desegregation remedies may be imposed must begin with a consideration of the principles enunciated by the Supreme Court in *Milliken v. Bradley,* 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). The Court in reversing the proposed interdistrict remedy in that case did not foreclose all metropolitan desegregation plans. As said in *Hills v. Gautreaux,* 425 U.S. 284, 298, 96 S.Ct. 1538, 1546, 47 L.Ed.2d 792 (1976):

> Nothing in the *Milliken* decision suggests a per se rule that federal courts lack authority to order parties found to have violated the Constitution to undertake remedial efforts beyond the municipal boundaries of the city where the violation occurred.

The underlying principle controlling the question of whether an interdistrict remedy

---

**3.** The doctrine of the law of the case has been explained by the Supreme Court as follows:

When matters are decided by an appellate court, its rulings, unless reversed by it or a superior court, bind the lower court. Thus a cause proceeds to a final determination. While power rests in a federal court that passes an order or decision to change its position on subsequent review in the same cause, orderly judicial action, except in unusual circumstances, requires it to refuse to permit the relitigation of matters or issues previously determined on a former review. *Insurance Group Committee v. Denver & Rio Grande R.R.,* 329 U.S. 607, 612, 67 S.Ct. 583, 585, 91 L.Ed. 547 (1947).

is appropriate is that "the scope of the remedy is determined by the nature and extent of the constitutional violation." 418 U.S. at 744, 94 S.Ct. 3112, 3127. Interdistrict relief was found impermissible in *Milliken* because there was no evidence that either the State or any of the suburban school districts had engaged in unconstitutional activity which had a cross-district effect. *Id.* at 748, 94 S.Ct. 3112. The interdistrict decree was therefore impermissible because it was not commensurate with the constitutional violation to be repaired. *See Gautreaux,* 425 U.S. at 294, 96 S.Ct. 1538.

█ Before a court may impose an interdistrict remedy, a constitutional violation, *i. e.,* intentional state action, must exist which has significant segregative interdistrict effects.[4] *Milliken,* 418 U.S. at 744–45, 94 S.Ct. 3112; *Gautreaux,* 425 U.S. at 294–96, 96 S.Ct. 1538. The Court in *Milliken* gave several examples of violations having an interdistrict effect, including actual district line crossings by students, deliberate drawing of district lines on the basis of race, and state actions that affect residential patterns by influencing the location of families with school children. 418 U.S. at 745, 94 S.Ct. 3112; 418 U.S. at 755, 94 S.Ct. 3112 (Stewart, J. concurring).

The district court in the instant case found two violations upon which it based the proposed interdistrict remedies. *See* 419 F.Supp. 180 (S.D.Ind.1975). The first was the failure of the State to extend the boundaries of IPS when the municipal government of Indianapolis and the other governmental units in Marion County were replaced by a consolidated county-wide government called "Uni-Gov." The second violation was the segregative housing practices by the State and its agents, such as the confinement of all public housing projects (in which 98% of the residents were black) to areas within the boundaries of the "old" City of Indianapolis. We must address each of these areas to determine whether either can form the basis for imposing interdistrict remedies under *Milliken.*

A

█ Whether the reestablishment of boundaries of the City of Indianapolis without the like reestablishment of IPS boundaries can form a basis for imposition of an interdistrict remedy within the "enlarged" City of Indianapolis requires a finding of intentional state action which causes a significant segregative interdistrict effect. To understand whether the Uni-Gov Act and its companion legislation meets the standards of *Milliken* requires a brief review of the history of school district boundaries in Indiana.

At Indiana common law, the boundaries of a school district and of a civil city were coterminous when a city expanded its corporate limits, the school boundaries expanded correspondingly.[5] This rule was codified as to IPS by a 1931 Act which provided that the boundaries of IPS were to be coterminous with those of the City.[6] In 1959 the

---

4. The place where the constitutional violation occurred is irrelevant for imposing interdistrict relief. It makes no difference whether the violation is inter- or intra-district. The crucial question is rather whether the violation caused or created a cross-district or interdistrict effect.

5. *See* cases cited in 332 F.Supp. 655, 675 n. 86 (S.D.Ind.1971).

6. Acts 1931, ch. 94, § 1, provided in relevant part:
   [I]n each civil city of this state having . . . more than three hundred thousand inhabitants there shall be a common school corporation hereinafter called the "school city" whose duties shall be co-extensive with the corporate boundaries of such civil city.

Although this Act was amended in 1955 in order to increase the size of the IPS Board, the provision concerning the boundaries of IPS remained unchanged. Acts 1955, ch. 123, § 1.

On March 15, 1969, two days after the Uni-Gov Act was signed into law, section 1 of the 1931 Act was again amended, this time deleting all reference to the correspondence of boundaries of IPS and Indianapolis. Acts 1969, ch. 283, § 1; Ind.Code § 20–3–11–1.

Although the 1931 statute applied only to the City of Indianapolis, the boundaries of school districts and municipalities were also coterminous elsewhere in Indiana. *See* 541 F.2d at 1217.

Indiana General Assembly enacted the School Reorganization Act[7] which had the effect of reducing the number of school districts outside Marion County from 990 to 305. 541 F.2d at 1217. The reorganized districts, however, were not tied to the boundaries of civil government and indeed some of the consolidated school districts even crossed county lines.[8] Once the school districts were consolidated, their boundaries were frozen and were no longer tied to civil annexation. For a variety of reasons, all attempts failed to consolidate IPS with any of the other ten suburban school districts within Marion County.[9]

In 1961 special legislation was enacted to give the Marion County schools the flexibility lost by the 1959 Reorganization Act.[10] Under this legislation extension of the boundaries of a civil city automatically extended the corresponding school district boundaries.[11] In summary, with the exception of the two year period 1959–61, the expressed policy of the State of Indiana until 1969 was that IPS would expand as the City of Indianapolis expanded.

Against this backdrop, two pieces of legislation were enacted by the Indiana General Assembly in 1969. Most notable was the Uni-Gov Act which transformed the "old" City of Indianapolis and the rest of Marion County into a consolidated government.[12] Uni-Gov succeeded to most of the functions of the city and county governments and of numerous special service districts.[13]

Under prevailing Indiana law prior to 1969, the expansion of the City of Indianapolis to the Marion County lines carried out by the Uni-Gov Act would have automatically caused the concomitant expansion of IPS. But sixteen days before final passage of the Act, the General Assembly repealed

---

7. Acts 1959, ch. 202, § 1; Ind.Code §§ 20–4–1–1 et seq.

8. Some seventy percent of the reorganized districts were not coterminous with other units of civil government. 541 F.2d at 1217.

9. See 541 F.2d at 1217–18. See also 368 F.Supp. at 1203–04.

10. Acts 1961, ch. 186; as amended, Ind.Code § 20–3–14–1.

11. Section 9 of the 1961 statute, which applied only to the City of Indianapolis, provided in pertinent part:
    (a) Whenever the boundaries of any civil city are extended by a civil annexation . . . the boundaries of the school city which has jurisdiction over the area of such civil city or the major portion thereof shall be correspondingly extended by virtue of such civil annexation.
    The expansion of the school boundaries under this provision was automatic unless the school city and the losing school corporation mutually agreed against expansion of school corporations. Section 9(c). In addition, the school corporation whose territory was to be taken could oppose the civil annexation in a remonstrance suit. Section 9(b). Under this provision, however, a remonstrance to both school and civil annexation was necessary.
    Chapter 186 of the Acts of 1961 also provided for two means wherein IPS could expand independently of the city. Section 3 permitted expansion if the IPS Board and the losing school corporation mutually agreed that IPS could expand. Section 4 gave IPS the unilateral power of annexation subject to the right of the losing school district to oppose by remonstrance on educational grounds only. Ind.Code §§ 20–3–14–3 to 20–3–14–6. No significant action was taken by IPS under these two provisions because they proved to be ineffective.

12. This Act was officially entitled the "Consolidated First-Class Cities and Counties Act," Acts 1969, ch. 173, § 101; Ind.Code §§ 18–4–1–1 et seq. See n. 2 supra.

13. Schools were specifically excluded from Uni-Gov as were some other governmental units, including inter alia, airport authority, health and hospital corporations, county department of welfare, housing authority, etc. Ind.Code § 18–4–3–14. Most of these units, including the schools, were previously independent having a corporate and legal identity separate from the City of Indianapolis. Many of these units had been reorganized before passage of the Uni-Gov Act wherein their jurisdiction was expanded to the Marion County lines. As noted earlier, see n. 9 supra, all attempts to consolidate and reorganize the Marion County schools failed.
    The effect of Uni-Gov on the schools, as with the other excluded governmental units, was to keep their independent and autonomous status. As developed more fully in the text, the Uni-Gov Act, by itself, did not freeze the boundaries of IPS; the Act did not even mention boundaries. The sole effect of Uni-Gov on the schools was to maintain their prior independent status.

section 9 of the 1961 Act.[14] This repeal for the first time separated the boundaries of IPS and the City of Indianapolis. This action had the effect of preventing the expansion of IPS boundaries. But for the repeal of the 1961 Act, IPS would now be coextensive with Marion County and this case would have a far different cast.[15] While we cannot say that this was done with a discriminatory purpose or intent because the district court has never addressed the question and for that reason the case must be remanded, *see* Part III *infra*, it is clear that this repeal and the other legislation enacted satisfied any formal test for state action.

The situation here thus differs from *Milliken* in at least one important aspect. In *Milliken* the school boundaries which limited the area into which a remedy could extend had apparently developed without consideration of race. At least no one appears to have contended that the boundaries were the product of racially invidious decisions of the State. In the instant case the legislature has, while this litigation was pending, chosen to enlarge the boundary of the City of Indianapolis for many municipal purposes while retaining the old IPS boundary for school purposes.[16] As shown above, this separation of the Indianapolis city boundary from the school district boundary was contrary to the State's traditional policy.

State action being present, our query next turns to whether that action caused significant segregative districtwide effects. In what way did the State's choice of retaining the old IPS boundary in lieu of expanding it with the City boundary have a segregative impact? It did so, we think, in curtailing the power of IPS to remedy its own violations. Had IPS expanded with the City, it could have accomplished desegregation by spreading its black school population throughout a larger area, much as the district court ordered. If IPS were recalcitrant about correcting its own violation, the district court could have more readily ordered such dispersal of the black school population without curtailment of district lines. This very lawsuit, challenging racial segregation in Indianapolis, was already pending when the legislative choice was made to confine IPS to its old boundary rather than make it coterminous with the City. In short, the combined 1969 legislation had the effect of ensuring that the effort to desegregate IPS (which had been initiated a year earlier by the Department of Justice) would not extend to the white suburban areas.

14. Acts 1969, ch. 52, § 2.

15. Four pieces of legislation were adopted by the 96th Session of the General Assembly in 1969 which affected IPS and its boundaries. These statutes were all enacted within eighteen days of each other. On February 25, the General Assembly repealed section 9 of the 1961 Act which had permitted the automatic expansion of IPS boundaries. Acts 1969, ch. 52, § 2; Ind.Code § 20–3–14–11. On the same day, the General Assembly added section 9(a) to the 1961 Act. This amendment effectively nullified the 1931 Act which had defined the boundaries of IPS as being coterminous with those of the City of Indianapolis. Acts 1969, ch. 52, § 3; Ind.Code § 20–3–14–9.

On March 13, 1969, the Uni-Gov Act was signed into law. Acts 1969, ch. 173. Section 314 of that chapter provided in pertinent part:
All other municipal corporations . . . shall not be affected by this act . . . . Without limiting the generality of following enumeration, such municipal corporations . . . . shall include . . . any school corporation, all or part of the territory of which is in the Consolidated City or County. Ind.Code § 18–4–3–14.

Two days later, on March 15, the General Assembly amended the 1931 Act, eliminating the provision that IPS boundaries must be coextensive with those of the City of Indianapolis. Acts 1969, ch. 283, § 1; Ind.Code § 20–3–11–1.

16. This is not therefore a case, as in *Milliken*, where the state merely failed to redraw school district lines which may have been neutrally drawn initially. Rather, this case is more similar to those where the state actually redraws the district lines. *See, e. g., Wright v. Council of City of Emporia*, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); *United States v. Scotland Neck Board of Education*, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). Here the 1969 repeal of the 1961 Act prevented and froze what would have been a natural expansion of the IPS boundaries when the City of Indianapolis expanded to the county lines.

In light of the above, we hold that the passage of Uni-Gov and its companion legislation meets the requirements of *Milliken* and therefore can be used as a basis for imposing an interdistrict remedy if the district court finds that the General Assembly, in enacting the series of legislation, acted with a discriminatory intent or purpose.

### B

It is generally agreed that racial residential patterns are reflected in the student composition of an area's public schools and that racial segregation in public schools and racial segregation in housing are integrally interrelated.[17] Metropolitan Indianapolis is no exception to this phenomenon. In 1970, 98.5% of all black people in Marion County lived in the "old" City of Indianapolis, the area served by IPS. 332, F.Supp. at 663.

17. If a school system follows a neighborhood attendance policy, as does IPS, the racial composition of a residential area directly affects the racial composition of the schools.

18. The overall black student population in Marion County has increased from 21% in 1968–69 to 26% in 1976–77, a net increase of five percent. As the following table shows, however, this increase has not been uniform among the school districts.

PERCENTAGE OF BLACK STUDENTS IN
MARION COUNTY SCHOOL
DISTRICTS

| School District | 1968–69 | 1976–77 | net change |
|---|---|---|---|
| IPS | 34% | 45% | +11% |
| Beech Grove | 0 | — * | — * |
| Decatur | 0 | — | — |
| Franklin | — * | — | — |
| Lawrence | — | 6 | + 6 |
| Perry | — | — | — |
| Pike | 4 | 17 | +13 |
| Speedway | 0 | 1 | + 1 |
| Warren | — | 2 | + 2 |
| Washington | 6 | 17 | +11 |
| Wayne | 1 | 2 | + 1 |

* Less than one percent.

The evidence thus shows IPS is becoming increasingly black (45% in 1976–77 v. 34% in 1968–69), while the suburbs remain overwhelmingly white. In 1976–77 the percentage of black students in seven of the ten suburban Marion County school districts was still less than two percent.

19. IPS is only one of eleven school districts in Marion County, the area covered by Uni-Gov.

Thus we find that blacks are concentrated in the "old" city while the suburbs are almost entirely populated by whites. This racial division in residential patterns is reflected in the public schools of metropolitan Indianapolis. During the 1968–69 academic year, 96.8% of all black students within Marion County attended schools served by IPS. Thus IPS was at the time this suit was filed and continued to be [18] racially segregated from the outlying school districts.[19]

Undoubtedly there are many contributing causes for racial segregation. But however complex the problem, it is clear that if residential segregation results from current or past segregative housing practices, there is a causal relation between those practices and the segregated schools.[20] Therefore, if

Although IPS serviced fifty-two percent of all Marion County public school students during the 1976–77 academic year, it serviced ninety percent of all the black students. The following table shows the present racial disparity between IPS and the outlying districts.

| School District | Percent of Total Student Enrollment in County | Percent of Total Black Enrollment in County |
|---|---|---|
| IPS | 52% | 90% |
| Beech Grove | 2 | — * |
| Decatur | 3 | — |
| Franklin | 2 | — |
| Lawrence | 6 | 1 |
| Perry | 8 | — |
| Pike | 3 | 2 |
| Speedway | 1 | — |
| Warren | 7 | — |
| Washington | 9 | 6 |
| Wayne | 8 | 1 |
| | 101% ** (156,812) | 100% (40,695) |

* Less than one-half of one percent.
** The total of 101% is due to rounding off to the nearest whole number.

20. The converse is also true: the racial composition of a school can also affect residential patterns. This is particularly so for couples with young families, one of the most residentially mobile groups in society. Although choice of location largely depends on available housing and economics, it also depends to a degree on the local schools. The influence of school patterns was noted by the Supreme Court in *Swann v. Board of Education*, 402 U.S.

the state has participated in or contributed to these segregative housing practices either directly (*e. g.*, selective location of public housing) or indirectly (*e. g.*, involvement in discriminatory practices in the private housing market), it can be said that the state has caused, at least in part, the segregation in schools.

That segregative housing practices can be the basis of an interdistrict school desegregation remedy was suggested by Mr. Justice Stewart's concurrence in *Milliken*.[21] Justice Stewart noted that if school segregation flows from a "purposeful, racially discriminatory use of state housing laws, then a decree calling for the transfer of pupils across district lines might well be appropriate." 418 U.S. at 755, 94 S.Ct. at 3132.

In *Evans v. Buchanan*, 393 F.Supp. 428 (D.Del.1975), the district court justified submission of a metropolitan remedy for school desegregation in part on governmental involvement in fostering segregated housing, which in turn caused segregation in the schools. The three-judge court in *Evans* found the development of "identifiably black schools mirrored population shifts," and that those population shifts resulted in part from "assistance, encouragement, and authorization by governmental policies." *Id.* at 434. The Supreme Court summarily affirmed this decision, 423 U.S. 963, 96 S.Ct. 381, 46 L.Ed.2d 293 (1975), and the Third Circuit subsequently affirmed the actual

imposition of an interdistrict remedy. 555 F.2d 373 (3d Cir. 1977), *modifying and aff'g*, 414 F.Supp. 328 (D.Del.1976).

Considering the foregoing observations, we hold that an interdistrict desegregation remedy is appropriate if the following circumstances are shown to exist (given the fact that there is a vast racial disparity between IPS and the surrounding school districts within the "new" City of Indianapolis): (1) that discriminatory practices have caused segregative residential housing patterns and population shifts; (2) that state action, at whatever level, by either direct or indirect action, initiated, supported, or contributed to these practices and the resulting housing patterns and population shifts; and (3) that although the state action need not be the sole cause of these effects, it must have had a significant rather than a *de minimis* effect. Finally, an interdistrict remedy may be appropriate even though the state discriminatory housing practices have ceased if it is shown that prior discriminatory practices have a continuing segregative effect on housing patterns (and, in turn, on school attendance patterns) within the Indianapolis metropolitan area.

The record shows that the district court already has received evidence and has made certain findings in the area of housing discrimination. *See Indianapolis I*, 338 F.Supp. at 1204–05; *Indianapolis IV*, 419

1, 20–21, 91 S.Ct. 1267, 1278, 28 L.Ed.2d 554 (1971):

People gravitate toward school facilities, just as schools are located in response to the needs of people. The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.

\* \* \* \* \* \*

It [location and closing of schools] may well promote segregated residential patterns which, when combined with "neighborhood zoning," further lock the school system into the mold of separation of the races. Upon a proper showing a district court may consider this in fashioning a remedy.

*See also Keys v. School District No. 1*, 413 U.S. 189, 202–03, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973).

Schools can also affect people other than families with school-aged children. Realtors, homeseekers, and prospective tenants often use the local schools (and their racial composition) as a key indicator as to the kind of neighborhood an area is or will become.

21. The Court in *Milliken* explicitly stated that "in its present posture, the case does not present any question concerning possible state housing violations," 418 U.S. at 728, 94 S.Ct. at 3119, n. 7, noting that the issue had not been considered by the court of appeals. Thus *Milliken* did not foreclose the use of housing violations as a basis for imposing interdistrict remedies as some would suggest. *See* 541 F.2d at 1228 n. 8 (Tone, J., dissenting).

F.Supp. at 183–85. It is important, however, that on remand the district court specify what state-responsible housing practices of a discriminatory nature, if any, have resulted, at least in part, in segregative residential patterns. This is necessary not only to determine initially whether an interdistrict remedy is appropriate, but also to fashion an appropriate remedy.[22]

### C

Although we hold that either the enactment of Uni-Gov and its companion legislation or state discriminatory housing practices may provide a basis for implementing interdistrict relief, we must address one further point. The suburban school officials may not maintain that their districts should be excluded from any interdistrict remedy if they are found innocent of committing any constitutional violations because they should not be held responsible for the acts of the state legislators or other state subdivisions such as a local housing authority or a zoning board. The commands of the Fourteenth Amendment are directed at the state and cannot be avoided by a fragmentation of responsibility among various agents. *Cooper v. Aaron*, 358 U.S. 1, 15–17, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). If the state has contributed to the separation of the races, it has the obligation to remedy the constitutional violations. That remedy may include school districts which are its instrumentalities and which were the product of the violation. Thus, if state

discriminatory housing practices have a substantial interdistrict effect, it is appropriate to require school authorities to remedy the effects even though they did not themselves cause this aspect of school segregation.[23] As Chief Justice Burger said in *Milliken*:

> Of course, no state law is above the Constitution. School district lines and the present laws with respect to local control, are not sacrosanct and if they conflict with the Fourteenth Amendment federal courts have a duty to prescribe appropriate remedies. 418 U.S. at 744, 94 S.Ct. at 3127.

### III

Even though segregative action for which the state or its agents may have been responsible comes within the governing principles of *Milliken*, the district court on remand must also determine whether that action (or inaction) was made with a racially discriminatory purpose.

In *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the Supreme Court held that state action is not racially discriminatory within the meaning of the Equal Protection Clause unless the action was taken for the purpose of discriminating between the races. If *Davis* did not change the law,[24] it at least changed the way lower courts had consistently interpreted it.[25] Because that case was decided after

---

**22.** In *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), the Supreme Court held that a district court, upon finding a constitutional violation, must first determine how much incremental effect the violations had on the racial imbalance in the schools. As a remedy can be designed to redress only the difference between the present racial distribution and what it would have been in the absence of constitutional violations, specific and detailed findings are required on remand.

**23.** That a remedy may include agencies of the state not themselves implicated in the constitutional violation was again recognized in *Milliken*. In that case the Court acknowledged that a desegregation remedy could have included the suburbs had the evidence shown that the violations by the Detroit school board produced

significant interdistrict segregative effects. *Milliken v. Bradley*, 418 U.S. 717, 744–45, 748, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). *See also Hills v. Gautreaux*, 425 U.S. 284, 292–94, 296 n. 12, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976).

**24.** *See, e. g., Palmer v. Thompson*, 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971).

**25.** *See, e. g.*, cases collected in *Washington v. Davis*, 426 U.S. at 244 n. 12, 96 S.Ct. 2040. For example, in *Hawkins v. Town of Shaw*, 461 F.2d 1171 (5th Cir. 1972) (*en banc*), one of the decisions explicitly disapproved in *Davis*, the court stated: "In order to prevail in a case of this type it is not necessary to prove intent, motive or purpose to discriminate on the part of city officials." *Id.* at 1172.

the instant case was last before the district court, neither the Government nor the intervening plaintiffs offered any evidence showing a racially discriminatory purpose.[26] Statements in earlier opinions in this case suggesting that there was no showing of discriminatory purpose should be disregarded in view of the fact that such showing was not deemed relevant at the time. Accordingly, we must remand this case so that the district court may make findings on the question of intent consistent with *Davis* and *Arlington Heights*.

Because of the protraction of this litigation, we make the following observations with the hope that this matter can be expedited and that further appeals can be avoided.

The key to an understanding of *Washington v. Davis* can be found in the following passages. Courts must adhere "to the basic equal protection principle that the invidious quality of a law must ultimately be traced to a racially discriminatory purpose. . . . This is not to say that the necessary discriminatory racial purpose must be expressed or appear on the face of the statute, or that a law's disproportionate impact is irrelevant in cases involving Constitution-based claims of racial discrimination. . . . Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." 426 U.S. at 240–42, 96 S.Ct. at 2048–49.

The Court amplified its intent requirement in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). It noted that "*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." Nor must it be shown that the intent to discriminate was the dominant or primary purpose. Rather the segregative intent need be only a "motivating factor in the decision" to establish a constitutional violation.[27] *Id.* at 265–66, 97 S.Ct. at 563.

The Court in *Arlington Heights* further stated: "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266, 97 S.Ct. at 564. The first and often the most probative indicia of discriminatory purpose is the disproportionate impact or effect a law or other official act may have.[28] In some circumstances impact alone may be sufficient.[29] For example, where the discriminatory impact is great that impact may "demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds." 426 U.S. at 242, 96 S.Ct. at 2049. As Mr. Justice Stevens observed in his concurrence in *Davis*, "when the disproportion is . . . dramatic . . . it really does not matter whether the standard is phrased in terms of purpose or effect." *Id.* at 254, 96 S.Ct. at 2054.

---

**26.** As Judge Tone recognized in dissenting in our previous opinion:

The [plaintiffs] do not argue that the evidence shows a racially discriminatory purpose. In their briefs, filed before the decision in *Washington v. Davis*, the government assumes, and the intervening plaintiffs argue, that such a purpose need not be shown. *United States v. Board of School Commissioners*, 541 F.2d 1211, 1226 (7th Cir. 1976).

**27.** Thus a complainant does not have to establish that "but for" the segregative intent the decision would not have been made. Such rigorous proof is not required not only because of the extreme evidentiary difficulties in proving that fact, *see Washington v. Davis*, 426 U.S. at 253, 96 S.Ct. 2040 (Stevens, J., *concurring*); *Palmer v. Thompson*, 403 U.S. 217, 224–25, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), but also

because an illicit motive may be only subordinate and still affect the outcome of a decision. *See* Best, *Palmer v. Thompson: An Approach to the Problem of Unconstitutional Legislative Motive*, 1971 Sup.Ct.Rev. 95, 119.

**28.** The impact of the official action is usually the first factor to be examined because, regardless of the presence of a segregative intent, a law without a discriminatory impact does not give rise to a cause of action.

**29.** This is not to say that it is the impact or effect which triggers the constitutional violation. Rather, when the discriminatory purpose becomes so stark, it becomes obvious that there could be no other basis for the action other than a discriminatory one.

Where the effect or impact is not so great so as to itself infer segregative intent, a number of factors were noted to be relevant by the Court in *Arlington Heights*. They include:

(1) the historical background of the decision, particularly if it reveals a series of official actions taken for invidious purposes;

(2) the specific sequence of events leading up to the challenged decision;

(3) departures from the normal procedural sequence;

(4) substantive departures, particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached; and

(5) the legislative or administrative history of a decision. 429 U.S. at 267–68, 97 S.Ct. at 555.

Discriminatory purpose is inferred from considering the totality of the available circumstantial evidence. *Davis*, 426 U.S. at 229, 96 S.Ct. 2040. Even if no individual act carries unmistakable signs of racial purpose, a clear pattern is sufficient to give rise to a permissible inference of segregative intent. *Armstrong v. Brennan*, 539 F.2d 625, 637 (7th Cir. 1976).

*Arlington Heights*, while amplifying the intent requirement set forth in *Davis*, did not answer the crucial question of what type of intent a plaintiff must show in order to make out a prima facie case under the Equal Protection Clause. In short, *Arlington Heights* instructed the lower courts where to look for the required intent without defining its imminent nature. It is clear, however, that the *Davis* requirement of discriminatory purpose is not *scienter* (as known in the criminal law) and is not the subjective motives of individual state officials, be they legislators or members of a local school or zoning board.[30] Such a test would pose an impenetrable evidentiary barrier for plaintiffs, for in an age when it is unfashionable for state officials to openly express racial hostility, direct evidence of overt bigotry will be impossible to find. Because a subjective test fails to measure the presence of discriminatory purpose when officials act discreetly, it is an outdated tool in the enforcement of the Equal Protection Clause.[31]

There is, however, a more fundamental barrier to the use of a subjective standard of intent which would direct courts to evaluate the motives of the individuals who comprise an institution or state agency. It has been established since *Fletcher v. Peck*, 10 U.S., (6 Cranch) 87, 130–31, 3 L.Ed. 162 (1810), that a court may not invalidate legislation based on the improper motives of the legislators who enacted it. In *Palmer v. Thompson*, 403 U.S. 217, 224–26, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), the Supreme

---

**30.** Thus the terms "purpose" and "intent" must be distinguished from the word "motive" which usually refers to the subjective intent of individuals.

**31.** A subjective test for intent has other crippling disadvantages as well. Under such a standard, it is unclear whose intent it is appropriate for the courts to examine. For example, it was the General Assembly which enacted the Uni-Gov Act and its companion legislation. Arguably, we therefore ought to scrutinize the legislative history of that legislation as well as any other records of what the members of the General Assembly were thinking during that period for evidence of subjective discriminatory intent. But which legislators' minds should we consider? Only those who voted in favor of the legislation? But what of those legislators who voted for legislation but did not harbor any racial motive? Should their votes be discarded? Likewise, should the votes of those who were racially motivated be considered in judging the legislation? As Mr. Justice Stevens observed in *Washington v. Davis*, "A law conscripting clerics should not be invalidated because an atheist voted for it." 426 U.S. at 253, 96 S.Ct. at 2054.

There is a more basic problem in limiting a search to the subjective motives of the individual legislators. To so limit our inquiry is to ignore the fact that the legislature frequently is nothing but a conduit for the desires of the individuals or interest groups which have influence and are sources of power. To be comprehensive in our search we would have to examine their motives as well. At that point, however, we would be in a quandary, for there is no way to determine with any certainty the degree to which bigotry on the part of these persons or interest groups actually affected the General Assembly's decision.

Court held that legislation could be justified by racially neutral reasons could not be attacked on the ground that legislators were motivated by racial bigotry. Moreover, the Court in *Davis* held that this aspect of *Palmer* remained law, by interpreting *Palmer* as holding "that the legitimate purposes of the ordinance . . . were not open to impeachment by evidence that the councilmen were actually motivated by racial considerations." 426 U.S. at 243, 96 S.Ct. at 2049. If discriminatory purpose is required for a constitutional violation, the inevitable conclusion is that the "segregative purpose or intent" relevant for equal protection analysis differs from the motivation of individual decisionmakers.

It is clear, therefore, that discriminatory purpose for constitutional analysis is to be gleaned not from individual officials but from the relevant governmental institutions. As a subjective test would be impossible to apply in such circumstances, the courts are driven to adopt an objective criterion in determining whether the challenged state action is imbued with a segregative intent or purpose. Such a criterion must include an examination of the institutional policy that underlies the action.[32] (By "policy" we mean a deliberate course of action, selected among alternatives, that is deemed advantageous or expedient.) We agree with the Sixth Circuit when it said:

> A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively established that their action or inaction was a consistent and resolute application of racially neutral policies. *NAACP v. Lansing Board of Education*, 559 F.2d 1042, 1046–47 (6th Cir. 1977), *quoting Oliver v. Michigan State Board of Education*, 508 F.2d 178, 182 (6th Cir. 1974).

Thus if plaintiffs establish either that the governmental action or inaction under scru-

tiny does not further the governmental policies or that the government ignored less segregative options which would have furthered its policies as effectively as the more segregative option it chose, *see Armstrong v. Brennan*, 539 F.2d 625, 636 (7th Cir. 1976), then a prima facie case of discriminatory intent or purpose has been made out. This inference is justifiable because governmental institutions must be presumed to have knowledge of the natural and foreseeable consequences of their action or inaction, and because there are rarely significant nonracial reasons for preferring a more rather than less segregative alternative.

### IV

■ The district court's injunctive order against the Housing Authority of the City of Indianapolis ("HACI") must also be reexamined in light of *Washington v. Davis* and *Arlington Heights* for reasons which we shall develop. But first we state the facts as shown by the record before us.

Upon remand from this court in 1974, the district court entertained a cross-complaint brought by the IPS Board against the Metropolitan Development Commission of Marion County ("Commission") and the HACI, which were brought into the case as additional defendants. The cross-complaint alleged that the Commission and HACI materially contributed 'to segregation in IPS by consistently building public housing projects within the borders of IPS rather than in suburban areas, despite HACI's authority to build housing within five miles of the city limits and the Commission's countywide jurisdiction. The court found that the Board's allegation was correct, and concluded that the inevitable effect of this policy was to increase the racial disparity between IPS and the suburban school districts because 98% of public housing tenants were black.

The court placed a major part of the responsibility for the lack of public housing in the suburbs on the resistance of subur-

32. *See generally*, Note, *Reading the Mind of the School Board: Segregative Intent and the De Facto De Jure Distinction*, 86 Yale L.J. 317, 333–43 (1976).

ban officials to the movement of blacks into their areas. It found:

> Suburban Marion County has resisted the erection of public housing projects outside IPS territory, suburban Marion County officials have refused to cooperate with HUD on the location of such projects, and the customs and usages of both the officials and inhabitants of such areas has been to discourage blacks from seeking to purchase or rent homes therein, all as shown in detail in previous opinions of this Court. 419 F.Supp. at 183.

To remedy the segregative effect of the placement of public housing projects, the court enjoined HACI from building future projects within IPS.[33] It also prohibited HACI from reopening Lockefield Gardens, a vacant project, to anyone but elderly tenants. *Id.* at 186.

The district court's injunction rested on the conclusion that HACI and the Commission had violated the Equal Protection Clause. The court's holding was based on two findings: first, HACI and the Commission always located public housing within IPS even though they had authority to build in the suburbs; and second, suburban officials consistently resisted the construction of public housing outside of IPS. Although the court's findings show that the policies pursued by HACI and the Commission produced racial discriminatory effects, under *Davis* and *Arlington Heights* discriminatory impact alone does not generally demonstrate a constitutional violation.

The district court did not determine whether HACI or the Commission acted with an invidious purpose in limiting the construction of public housing to IPS. Accordingly, it will be necessary to vacate the order and remand the case to the district court to make findings whether HACI or the Commission acted with discriminatory intent. If they did, an injunctive order similar to the one appealed from would be appropriate.

But it is also possible that the actions of both agencies were totally devoid of discriminatory intent, and they failed to build public housing in the suburbs solely because suburban officials would not permit them to do so. Such a finding, however, would not end the inquiry. If it is determined that some or all of the suburbs resisted public housing or refused to cooperate with HACI's effort to go beyond the boundaries of IPS on racial grounds and with the segregative intent to confine the black people of Marion County to the "black ghetto" of the inner city, such a determination alone would justify an injunctive order similar to the one appealed from.[34]

We also remand the interdistrict busing order for the reasons outlined in this opinion. Although the district judge's previous findings and discussions indicate that he had in mind the principle stressed in *Dayton v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), namely, that once a constitutional violation is found, the court must tailor the scope of the remedy to fit the nature of the violation, we believe that the district court should explicitly consider the appropriate application of that principle to the formulation of any interdistrict remedy.

The orders appealed from are vacated and the case is remanded for further proceedings consistent with this opinion.

---

**33.** HACI was not prohibited under the order from building projects outside of IPS.

**34.** It is true that the suburbs were not named as defendants in the IPS Board's cross-complaint. This fact is irrelevant, however, to the question of whether the requested injunctive relief should be granted against HACI. Ordinarily a person should not be held legally accountable for the action of a third party. But in the factual situation before us that axiomatic proposition is inapplicable. It does not matter whether HACI itself had a discriminatory intent in limiting public housing to IPS or whether the suburbs with discriminatory intent refused to cooperate, thus preventing HACI from expanding public housing projects beyond the IPS boundary. The result was the same and HACI, as a public agency, should not be free from an injunctive order merely because its conduct was forced from the outside. It should also be kept in mind that the remedy sought by the cross-complaint is against HACI—not against the suburbs—and therefore the inquiry may be extended to what, if any, suburban conduct with discriminatory intent influenced the action of HACI.

FAIRCHILD, Chief Judge, concurring.

I interpret the directions given by the Supreme Court on remand as requiring a determination whether or not (1) the state's separation of the municipal boundary from the school district boundary was done with intent to maintain the concentration of black students in IPS schools and (2) the Housing Authority's (and Commission's) choices in the location of housing were made with similar discriminatory intent. If the record required us to say as a matter of law that there was no such intent, we would reverse and direct denial of interdistrict relief and dismissal of the cross-complaint against HACI. If it required us to say as a matter of law that such intent was present, we would either affirm the decree, modify it, or reverse and remand for modification by the district court.

I agree with Judge Swygert that existence or absence of intent cannot be determined as a matter of law from the present record, particularly since that issue was not really tried, and therefore agree that we should reverse and remand for further proceedings and findings on the issue of intent. If such intent be found with respect to (1) or (2), or both, the district court should impose an appropriate interdistrict desegregation remedy. If such intent be found with respect to (2), the district court should also enter an appropriate injunction against HACI (and Commission). I concur in reversal with those directions.

I agree, generally, with Parts I and II of the opinion prepared by Judge Swygert.

With all respect, I do not subscribe to all the matters stated in Part III. In particular, I do not agree with the analysis of the issue of intent in terms of "type," "subjective test," or "standard" of intent.

I recognize, to be sure, the difficulties attendant upon determination of the "intent" with which an action is taken by a state legislature or other multi-member governmental body. It is often difficult to identify the group of individuals who controlled a particular decision and whose individual purposes in making it are therefore the most significant.

Fundamentally, however, the intent of a body of individuals with respect to a particular act of the body must be determined by the same process as an individual's intent is determined. It is to be inferred from acts (including acts and statements of individuals which can reasonably be attributed to the body) and surrounding circumstances (including foreseeable consequences of the act in question).

This is essentially a fact finding process. The Supreme Court has provided guidance in *Arlington Heights*, 429 U.S. at 266–68, 97 S.Ct. 555. As the Court stated:

> The foregoing summary identifies, without purporting to be exhaustive, subjects of proper inquiry in determining whether racially discriminatory intent existed.

429 U.S. at 268, 97 S.Ct. at 565.

Part IV deals with the injunction entered upon the IPS cross-complaint, forbidding HACI to build future public housing within IPS. I agree that there must be a finding as to the intent with which HACI chose the locations of its projects.

Where a suburb had power to prevent HACI from locating a project within it, that suburb's attitude would be relevant in the process of finding whether HACI acted with discriminatory intent in deciding to build elsewhere. Once HACI were found, however, to have acted with discriminatory intent, it is hard to see how the guilt or innocence of various suburbs would affect the scope of an injunction against HACI.

If and to the extent that relief were sought against a suburb on a claim that it violated rights either by preventing students from attending its schools or by preventing people from obtaining housing within its borders, its discriminatory intent would, of course, be relevant.

TONE, Circuit Judge, dissenting.

I remain of the view, stated in my dissent when the case was here before certiorari and remand, 541 F.2d at 1224, that the record contains no evidence that would support a finding of racially discriminatory purpose with respect to either Uni-Gov or selection of public housing sites. There is no need to repeat what was said there.

If the issue of discriminatory purpose had not been previously addressed by the parties or the trial court, and had first entered the case because of the Supreme Court's remand, it would be appropriate for us to remand to the District Court for the taking of evidence and findings on that issue. But that issue was previously in the case. Discriminatory purpose was specifically pleaded in paragraph 10 of the intervening plaintiffs' amended complaint, and evidence was offered in an attempt to prove that allegation after our last remand.[1] This was not an irrelevant allegation and it was not treated as such by counsel for the intervening plaintiffs, who understandably wanted two strings to their bow,[2] by counsel for the defendants, or by the district judge. The proof failed, and the district judge carefully, as I read his opinion, refrained from finding the presence of discriminatory purpose. The tenor of his findings on both the Uni-Gov and public housing issues was such that it is inconceivable that he would not have found discriminatory purpose if he had believed it warranted by the evidence. 419 F.Supp. at 182–183. In this tenth year of the litigation, I think that should be an end to the matter. The usual rule should be applied, and we should not send the case back to permit the intervening plaintiffs to make another attempt to prove allegations they have already tried but failed to prove, while a complete remedy for intra-district violations conclusively adjudicated in 1973 (474 F.2d 81) is delayed on the chance that an interdistrict remedy will ultimately emerge.[3]

Turning to the issues on remand, I shall not attempt to state the respects in which I disagree with the opinion announcing the judgment of the court, which are for the most part apparent from my earlier dissent, except to say that until now the District Court and this court have recognized that the only material distinctions between the facts in this case and those in *Milliken v. Bradley* lay in Uni-Gov and the siting of public housing projects by HACI. As for Part III of the opinion, with all respect, I do not think we make the district judge's task any easier by providing him with an advisory interpretation of Supreme Court decisions (which he can read as well as we can) when we cannot agree among ourselves how they should be interpreted.

---

1. Which was for a determination of "whether the establishment of the Uni-Gov boundaries without a like reestablishment of IPS boundaries warrants an inter-district remedy within Uni-Gov in accordance with *Milliken*." 503 F.2d 68, 86.

2. That the Court would hold as it did in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), was, at the very least, foreseeable as a possibility. See 426 U.S. at 239–245, 96 S.Ct. 2040; and see my earlier dissent, 541 F.2d at 1224.

3. The brief for the United States filed in the Supreme Court in connection with the 1976

appeals and petitions for certiorari in that Court stated as follows:

The United States commenced this suit to challenge racial discrimination by and within IPS. It prevailed on its claims. Full relief has been delayed for several years, however, while the district court has considered an expanded, inter-district remedy that the United States did not seek. In our view this delay has been fruitless, because the evidence has not demonstrated any purposeful inter-district racial discrimination of the sort that would justify an inter-district mandatory reassignment of students.